# NORTH DAKOTA *v.* UNITED STATES

No. 81–773.   Argued November 2, 1982—Decided March 7, 1983

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, POWELL, and STEVENS, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, J., joined, *post*, p. 321.

*Robert O. Wefald*, Attorney General of North Dakota, argued the cause for appellant. With him on the briefs were *Murray G. Sagsveen*, Special Assistant Attorney General, and *David E. Engdahl*.

*Barbara E. Etkind* argued the cause for the United States. With her on the brief were *Solicitor General Lee, Assistant Attorney General Dinkins, Deputy Solicitor General Claiborne, Edward J. Schawaker*, and *Robert L. Klarquist*.*

JUSTICE BLACKMUN delivered the opinion of the Court.

Under the federal Migratory Bird Hunting Stamp Act, the Secretary of the Interior is authorized to acquire easements over small wetland areas suitable for migratory waterfowl breeding and nesting grounds. Although the State of North Dakota initially consented to the Secretary's acquisition of easements over certain wetlands, the State now seeks to withdraw its consent and to impose conditions on any future acquisitions. This has led to the present litigation, for the State's present posture raises the question whether the Secretary may proceed to acquire easements pursuant to North Dakota's prior consent.

---

*\*Richard J. Himelfarb* filed a brief for the National Wildlife Federation et al. as *amici curiae* urging affirmance.

I

A

In 1929, the Migratory Bird Conservation Act (Conservation Act), 45 Stat. 1222, ch. 257, 16 U. S. C. § 715 *et seq.*, became law. By § 5 of that Act, 45 Stat. 1223, the Secretary of the Interior was authorized to acquire land "for use as inviolate sanctuaries for migratory birds."[1] Land acquisitions under the Conservation Act are subject to certain conditions: they must be approved in advance by the Migratory Bird Conservation Commission, §§ 2 and 5, 16 U. S. C. §§ 715a and 715d, and the State in which the land is located must "have consented by law to the acquisition," § 7, 16 U. S. C. § 715f.

In 1934, in order to provide funding for land acquisitions under the Conservation Act, the Migratory Bird Hunting Stamp Act (Stamp Act), 48 Stat. 451, 16 U. S. C. § 718 *et seq.*, was enacted. Section 1 of the Stamp Act, 16 U. S. C. § 718a, required waterfowl hunters to purchase migratory bird hunting stamps, commonly known as duck stamps. By § 4, 16 U. S. C. § 718d, the proceeds from the sale of the stamps were to form a special "migratory bird conservation fund" (conservation fund) to be used primarily to pay for "the location, ascertainment, acquisition, administration, maintenance, and development" of bird sanctuaries pursuant to the Conservation Act.

To hasten the acquisition of land suitable for waterfowl habitats, Congress amended the Stamp Act in 1958. The price of a duck stamp was increased, and, most important for our present purposes, the Secretary of the Interior was authorized to expend money from the conservation fund for a new type of property: "small wetland and pothole areas, interests therein, and rights-of-way to provide access thereto,"

---

[1] Section 5 was amended by § 5(a) of the Fish and Wildlife Improvements Act of 1978, Pub. L. 95–616, 92 Stat. 3113, with minor changes from the language quoted in the text. The sense of that language, however, was not altered. See 16 U. S. C. § 715d (1976 ed., Supp. V).

the small areas "to be designated as 'Waterfowl Production Areas.'" Pub. L. 85–585, § 3, 72 Stat. 487, 16 U. S. C. § 718d(c). Such waterfowl production areas could be "acquired without regard to the limitations and requirements of the Migratory Bird Conservation Act." *Ibid.* Because these waterfowl production areas did not have to be maintained as sanctuaries, there was no need for them to be purchased outright; the Secretary was authorized to acquire easements prohibiting fee owners from draining their wetlands or otherwise destroying the wetlands' suitability as breeding grounds.

Despite the 1958 amendments, however, the proceeds from duck stamp sales proved insufficient to acquire land at the rate Congress deemed necessary. Accordingly, a new source of income was provided through the Wetlands Act of 1961 (Loan Act), Pub. L. 87–383, 75 Stat. 813. Section 1 of this new Act originally authorized sums for appropriation not to exceed $105 million for a 7-year period.[2] These sums were to be added to the conservation fund in the form of interest-free loans that were to be repaid out of duck stamp proceeds. In addition, § 3 of the Loan Act provided that no land could be acquired with money from the conservation fund unless consent had been obtained from the Governor or an appropriate agency of the State in which the land was located.[3]

---

[2] The authorization loan limit was increased to $200 million by § 2(a) of the Wetlands Loan Extension Act of 1976, 90 Stat. 189, 16 U. S. C. § 715k–3.

[3] Section 3 reads in relevant part:

"*Provided further*, That no land shall be acquired with moneys from the migratory bird conservation fund unless the acquisition thereof has been approved by the Governor of the State or appropriate State agency." 75 Stat. 813, 16 U. S. C. § 715k–5.

This proviso is in addition to the Conservation Act's requirement, in its § 7, that the State "shall have consented by law" to the acquisition of land for inviolate bird sanctuaries. 45 Stat. 1223, 16 U. S. C. § 715f. The latter requires consent by the legislature; the former requires consent by the Governor or the "appropriate State agency."

## B

The principal waterfowl breeding grounds in the continental United States are located in four States of the northern Great Plains—North Dakota, South Dakota, Minnesota, and Montana.[4] North Dakota, in particular, is rich in wetlands suitable for waterfowl breeding, and the Government's acquisition of North Dakota land has been given high priority. See, e. g., H. R. Rep. No. 95–1518, p. 5 (1978); S. Rep. No. 94–594, p. 3 (1976).

For the most part, North Dakota has cooperated with federal efforts to preserve waterfowl habitats. Two years after the Conservation Act went into effect, the State, pursuant to § 7 of that Act, 45 Stat. 1223, 16 U. S. C. § 715f, gave its consent to the "acquisition by the United States . . . of such areas of land or water, or of land and water, in the State of North Dakota, as the United States may deem necessary for

---

[4] When the glaciers retreated from the northern Great Plains at the end of the last ice age, they left in their wake thousands of shallow depressions. These depressions, known as prairie potholes, provide excellent breeding grounds for migratory ducks. In *United States* v. *Albrecht*, 496 F. 2d 906 (CA8 1974), the Court of Appeals described the characteristics of a prairie pothole region and its advantages for breeding ducks:

"Each square mile of such land is dotted by approximately 70 to 80 potholes of three to four feet deep. . . . [On certain types of land] the potholes usually retain water through July or August, and therefore, provide an excellent environment for the production of aquatic invertebrates and aquatic plants, the basic foods for breeding adult ducks and their offspring. Essential to the maintenance of the land as a waterfowl production area is the availability of shallow water in these numerous potholes during the usually drier summer months. On the other hand, too much water, as a lake area with its deeper waters, does not provide the proper habitat for many species of duck to rear their young. Also, for the protection of their young, many species of duck prefer to be isolated in a small pothole, rather than to share a large lake." *Id.*, at 908–909.

See generally Kantrud & Stewart, Use of Natural Basin Wetlands By Breeding Waterfowl in North Dakota, 41 J. Wildlife Management 243 (1977); Prairie Potholes: Draining the Duck Hatchery, National Wildlife (Oct.–Nov. 1981) p. 6.

the establishment of migratory bird reservations." 1931 N. D. Laws, ch. 207, p. 360. By 1958, the United States had acquired more than 276,000 acres of North Dakota land for use as migratory bird refuges. Hearings on S. 2447 et al. before a Subcommittee of the Senate Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess., 79–81 (1958).

When the Loan Act was passed in 1961, the United States, through its Fish and Wildlife Service, promptly sought the necessary gubernatorial consent from Governor Guy of North Dakota. Between 1961 and 1977, Governor Guy and his successor, Governor Link, consented to the acquisition of easements covering approximately 1.5 million acres of wetlands. The consents specified the maximum acreage to be acquired within each county in the State, but did not list particular parcels.[5] By 1977, the Fish and Wildlife Service had obtained easements covering about half of the total wetlands acreage authorized by the consents.[6]

---

[5] The consents were in written form prepared by the Fish and Wildlife Service. Each covered a separate county, and read substantially as follows:

"I, ——————, Governor of the State of North Dakota, in accordance with the provisions of the Act of October 4, 1961, 75 Stat. 813, hereby grant approval to the acquisition of easements by the United States of America of any lands within the county of ——————, State of North Dakota, for Waterfowl Production Area purposes not to exceed ———— acres of wetlands." App. 3, 55.

Some of the forms were signed by the North Dakota Game and Fish Commissioner as the authorized representative of the Governor. *Id.*, at 4–5, 47.

[6] The typical easement agreement contained a legal description of a parcel of land, and imposed restrictions on all wetland areas within the parcel "now existing or subject to recurrence through natural or man-made causes," including "any enlargements of said wetland areas resulting from normal or abnormal increased water." The easements prohibit the owner from draining, filling, leveling or burning the wetlands, but permit farming and other activities whenever the wetlands "are dry of natural causes." *Id.*, at 14–16; see App. to Juris. Statement 6a–7a.

In the mid-1970's cooperation between North Dakota and the United States began to break down. The sources of the dispute are not altogether clear; the State accuses the United States of misleading landowners from whom it purchased easements, and of reneging on some unrelated agreements relating to flood-control projects. See Record 19–20, 40; Brief for Appellant 30–33. In any event, North Dakota enacted legislation in 1977 restricting the United States' ability to acquire easements over wetlands. 1977 N. D. Laws, ch. 204, p. 461, and ch. 426, p. 923.

The 1977 legislation affects the acquisition of wetlands easements in three major ways. First, § 2 of ch. 204, codified as N. D. Cent. Code § 20.1–02–18.1 (Supp. 1981), as amended by 1979 N. D. Laws, ch. 553, § 11, p. 1412,[7] re-

---

[7] North Dakota Cent. Code § 20.1–02–18.1, as amended (Supp. 1981), provides:

"Federal wildlife area acquisitions—Submission to county commissioners, opportunity for public comment, and impact analysis required. The governor, the game and fish commissioner, or their designees, responsible under federal law for final approval of land, wetland, and water acquisitions by the United States department of the interior, its bureaus or agencies, for waterfowl production areas, wildlife refuges or other wildlife or waterfowl purposes, shall submit the proposed acquisitions to the board of county commissioners of the county or counties in which the land, wetland, and water areas are located for the board's recommendations. An affirmative recommendation by the board must be obtained prior to final approval of all such proposed acquisitions, whether by transfer of title, lease, easement, or servitude.

"The board of county commissioners of the county affected, or a designee or designees of the board, shall, within twenty-one days of receipt of an acquisition proposal, physically inspect the proposed acquisition areas. The board shall give public notice of the date, hour, and place where the public may comment on the proposed acquisitions. The notice shall be published once each week for two successive weeks in the official newspaper of the county or counties in which the land and water areas are located. The notice shall set forth the substance of the proposed action, and shall include a legal description of the proposed acquisitions. The board of

quires the Governor to submit proposed wetlands acquisitions for approval by the board of county commissioners of the county in which the land is located. The "federal agency involved"—here, the United States Fish and Wildlife Service—must provide the county with a "detailed impact analysis," and the county, as well, is directed to prepare an impact analysis at federal expense. If the county does not recommend the acquisition, the Governor may not approve it. Next, § 3 of ch. 204, codified as § 20.1–02–18.2, as amended by 1981 N. D. Laws, ch. 258, p. 654,[8] authorizes the landowner

county commissioners shall make its recommendations within sixty days after receipt of an acquisition proposal.

"A detailed impact analysis from the federal agency involved shall be included with the acquisition proposal for board of county commissioner consideration in making recommendations. Such analysis shall include, but shall not be limited to, the recreational and wildlife impacts. In addition, the county agent of the affected county or counties shall prepare an impact analysis for board of county commissioner consideration which shall include the fiscal, social, and agricultural impacts of the proposed acquisitions. The department of the interior shall reimburse the county or counties for any expenses incurred by the county agent in preparing the analysis. The analyses shall also be forwarded to the state federal aid coordinator office which shall furnish copies to all interested state agencies and political subdivisions, which agencies and political subdivisions shall have thirty days to review the analyses and return their comments to the state federal aid coordinator office. Upon expiration of the thirty-day period, all comments received by the state federal aid coordinator office shall be forwarded to the federal agency involved and to the state official or agency responsible for final acquisition approval. The federal agency may, after consideration of such comments, file a final impact analysis with the governor, the board of county commissioners, and any other state official or agency responsible for final acquisition approval."

[8] North Dakota Cent. Code § 20.1–02–18.2, as amended (Supp. 1981), provides:

"Negotiation of leases, easements, and servitudes for wildlife production purposes. A landowner may negotiate the terms of a lease, easement, or servitude for land, wetland, or water areas sought to be acquired by the United States department of the interior, its bureaus or agencies, with moneys from the migratory bird conservation fund [16 U. S. C. 718d] for

to negotiate the terms and time period of the easement acquired by the United States, to restrict the easement "by legal description to the land, wetland, or water areas being sought," and to "drain any after-expanded wetland or water area in excess of the legal description." Finally, § 1 of ch. 426, codified as N. D. Cent. Code § 47–05–02.1 (1978),[9] restricts all easements to a maximum duration of 99 years. Because these restrictions have cast doubt upon the sufficiency of its title, the United States has acquired no easement over North Dakota wetlands since 1977.[10]

---

use as waterfowl production areas, wildlife refuges, or for other wildlife purposes.   A landowner may:

"1. Negotiate the time period of the lease, easement, or servitude being sought.

"2. Restrict a lease, easement, or servitude by legal description to the land, wetland, or water areas being sought, and may drain any after-expanded wetland or water area in excess of the legal description in the lease, easement, or servitude.

"Failure by the department of the interior, its bureaus or agencies, to agree to and comply with the above provisions shall nullify North Dakota's consent to the federal Act under section 20.1–02–18."

As originally enacted, § 20.1–02–18.2 also provided that any easement would terminate upon death of the landowner or a change in ownership. 1977 N. D. Laws, ch. 204, § 3, p. 463.   This provision was repealed by 1981 N. D. Laws, ch. 258, § 1, p. 654.

[9] Section 47–05–02.1 provides in relevant part:

"Regulations governing easements, servitudes, or nonappurtenant restrictions on the use of real property.—Real property easements, servitudes, or any nonappurtenant restrictions on the use of real property, which become binding after July 1, 1977, shall be subject to the regulations contained in this section.   These regulations shall be deemed a part of any agreement for such interests in real property whether or not printed in a document of agreement.

.     .     .     .     .

"2. The duration of the easement, servitude, or nonappurtenant restriction on the use of real property shall be specifically set out, and in no case shall the duration of any interest in real property regulated by this section exceed ninety-nine years."

[10] In 1981, while this case was pending in the Court of Appeals, North Dakota added a further provision forbidding any new federal acquisition

In 1979, the United States brought suit in the United States District Court for the District of North Dakota, seeking a declaratory judgment that the 1977 state statutes were hostile to federal law in certain respects and could not be applied; that any easement acquired in violation of the 1977 statutes would nevertheless be valid; and that the legislative-consent provision of the Conservation Act, § 7, 45 Stat. 1223, 16 U. S. C. § 715f, did not apply to the acquisition of waterfowl production areas under the Stamp Act. The District Court granted summary judgment for the United States, App. to Juris. Statement 16a, and the United States Court of Appeals for the Eighth Circuit affirmed. 650 F. 2d 911 (1981).[11] We noted probable jurisdiction over North Dakota's appeal. 455 U. S. 987 (1982).

## II

The protection of migratory birds has long been recognized as "a national interest of very nearly the first magnitude." *Missouri* v. *Holland,* 252 U. S. 416, 435 (1920). Since the turn of the century, the Secretaries of Agriculture and of the Interior successively have been charged with responsibility for "the preservation, distribution, introduction, and restoration of game birds and other wild birds." Act of May 25, 1900, 31 Stat. 187, 16 U. S. C. § 701. A series of treaties dating back to 1916 obligates the United States to preserve and protect migratory birds through the regulation of hunt-

---

of land for a migratory bird reservation, and suspending the Governor's authority to consent to any acquisition from the conservation fund. 1981 N. D. Laws, ch. 258, § 2, p. 654, codified as N. D. Cent. Code § 20.1–02–18.3 (Supp. 1981).

[11] The Court of Appeals held that neither legislative nor gubernatorial consent was required prior to the acquisition of waterfowl production areas, and that even if gubernatorial consent were required, it had been given here and could not be revoked. 650 F. 2d, at 916. The Court of Appeals also concluded that the challenged North Dakota statutes were void "[t]o the extent they encumber the federal statutes which provide for the acquisition of waterfowl habitat." *Id.,* at 918.

ing, the establishment of refuges, and the protection of bird habitats.[12]  By providing for the acquisition of sanctuaries and waterfowl production areas, the Conservation Act and the Stamp Act play a central role in assuring that our Nation's migratory birds will continue to flourish.

In the absence of federal legislation to the contrary, the United States unquestionably has the power to acquire wetlands for waterfowl production areas, by purchase or condemnation, without state consent.  *Paul* v. *United States,* 371 U. S. 245, 264 (1963); *Kohl* v. *United States,* 91 U. S. 367, 371–372 (1876).  Here, however, Congress has conditioned any such acquisition upon the United States' obtaining the consent of the Governor of the State in which the land is located.[13]  North Dakota concedes that its Governors, at var-

---

[12] Convention for the Protection of Migratory Birds, United States-Great Britain, 39 Stat. 1702, T. S. No. 628 (1916); Convention for the Protection of Migratory Birds and Game Mammals, United States-Mexico, 50 Stat. 1311, T. S. No. 912 (1936); Convention for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, United States-Japan, [1974] 25 U. S. T. 3331, T. I. A. S. No. 7990 (1972); Convention Concerning the Conservation of Migratory Birds and Their Environment, United States-Union of Soviet Socialist Republics, [1976–1977] 29 U. S. T. 4647, T. I. A. S. No. 9073 (1976).  Habitat protection is specifically mandated by the treaties with the Soviet Union, Art. IV, 29 U. S. T., at 4653–4654, and Japan, Art. VI, 25 U. S. T., at 3335.

[13] Despite some confusion on this issue in the District Court and the Court of Appeals, see App. to Juris. Statement 11a; 650 F. 2d, at 916, the parties now agree that gubernatorial consent *is* required.  See Brief for United States 16, and n. 11.  Section 4 of the Stamp Act, as amended in 1958, permits the acquisition of waterfowl production areas "without regard to the limitations and requirements of the Migratory Bird Conservation Act."  Pub. L. 85–585, § 3, 72 Stat. 487, 16 U. S. C. § 718d(c).  The Conservation Act, ch. 257, 45 Stat. 1222, is codified at 16 U. S. C. §§ 715–715k and 715n–715r.  The District Court and the Court of Appeals read the gubernatorial-consent requirement—codified at § 715k–5—as part of the Conservation Act, and concluded that it did not apply to the acquisition of waterfowl production areas.  This reading of the statute, we have concluded, is incorrect.  The gubernatorial-consent provision was enacted in 1961 as § 3 of the Loan Act.  75 Stat. 813.  It has never been a part of

ious times since 1961, have consented to the acquisition of easements over 1.5 million acres of North Dakota wetlands. The issue before us is whether North Dakota may revoke its consent to the acquisition of further easements in the State, and whether North Dakota by statute may impose conditions and restrictions on the United States' power to acquire easements.[14]

---

the Conservation Act. Although the codifiers of the United States Code chose to place the gubernatorial-consent provision in the midst of the Conservation Act's provisions, that choice, "made by a codifier without the approval of Congress . . . should be given no weight." *United States* v. *Welden*, 377 U. S. 95, 99, n. 4 (1964). Because the gubernatorial-consent provision is not one of the "requirements of the Migratory Bird Conservation Act," 16 U. S. C. § 718d(c), it does apply whenever waterfowl production areas are acquired with duck stamp funds.

[14] North Dakota advances two preliminary arguments which we find unpersuasive. The State first asserts that the gubernatorial consents given between 1961 and 1977 are invalid, because they do not specify the particular parcels to be acquired. The language of § 715k–5 does not suggest that parcel-by-parcel consent is necessary, and the legislative history tells us only that § 715k–5 requires consent "as to the nature of the lands and the acreage involved." 107 Cong. Rec. 17171 (1961) (remarks of Sen. Magnuson). The county-by-county consents given by Governors Guy and Link satisfied this standard. They specified both the "nature of the lands . . . involved," *i. e.*, wetlands, and the maximum acreage to be acquired in each county.

North Dakota next argues that the gubernatorial consents, if valid, have already been exhausted by acquisitions prior to 1977. This argument stems from the practice of including within each easement agreement the legal description of the entire parcel on which the wetlands are located, rather than merely the wetlands areas to which the easement restrictions. apply. If the entire parcels are counted toward the acreage permitted by the gubernatorial consents, the United States already has acquired nearly 4.8 million acres, far more than the 1.5 million acres authorized. The United States has conceded as much in its answers to North Dakota's interrogatories. App. 49 ("The total acreage described in the permanent easements . . . is 4,788,300 acres . . ."). As the easement agreements make clear, however, the restrictions apply only to wetlands areas and not to the entire parcels. The consents obtained by the United States authorize it to acquire up to 1.5 million "acres of wetlands." See n. 5, *supra*. The fact that the easement agreements include legal descriptions of much

A

North Dakota's central argument is that the gubernatorial consent required by 16 U. S. C. § 715k–5, once given, may be revoked by the State at will. North Dakota reads § 715k–5 to require not only that the Governor have consented to the acquisition of land for waterfowl production areas, but also that the Governor (and his successors in office) must continue to consent until the moment the land is actually acquired. Thus, although the United States has acquired easements over only half the acreage authorized by Governors Guy and Link, North Dakota asserts that it can terminate the United States' power to acquire the remainder.[15] The United States takes the position that § 715k–5 does not permit a State to revoke its consent at will; once consent has been given, "the role assigned to the state by Congress has been exhausted." Brief for United States 24.

As with any case involving statutory interpretation, "we state once again the obvious when we note that, in determining the scope of a statute, one is to look first at its language." *Dickerson* v. *New Banner Institute, Inc., ante,* at 110. See *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 19 (1979). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 108 (1980). The language of § 715k–5 is uncomplicated; it provides that money from the conservation fund shall not be used to acquire land "unless the acquisition thereof has been approved" by the Governor or the appropriate state agency. In this case, the

_____

larger parcels does not change the acreage of the wetlands over which easements have been acquired.

[15] In the District Court and the Court of Appeals, North Dakota took the position that its prior consents had been revoked. See App. 72. At oral argument, North Dakota informed us that although the present Governor has not formally revoked the consents, he intends to engage in that formality if this Court holds that revocation is authorized. Tr. of Oral Arg. 28.

acquisition of approximately 1.5 million acres of wetlands clearly "has been approved" by North Dakota's Governors. Nothing in the statute authorizes the withdrawal of approval previously given.[16]

Nor does the legislative history of § 715k–5 suggest that Congress intended to permit Governors to revoke their consent. Before 1961, neither legislative nor gubernatorial consent was required prior to the acquisition of wetlands for waterfowl production areas. State legislative consent was a prerequisite to the acquisition of bird sanctuaries, § 715f, but waterfowl production areas were expressly exempted from this requirement, § 718d(c). Nonetheless, the United States followed an informal practice of obtaining agreement from the Governor or appropriate state agency before acquisition. The gubernatorial-consent provision was intended simply to incorporate this practice. 107 Cong. Rec. 17171 (1961) (remarks of Sen. Magnuson); id., at 17172 (remarks of Sen. Hruska). There is no indication in the legislative history or elsewhere that under this prior practice a Governor could withdraw consent already given.[17]

---

[16] Cf. *United States* v. *Unzeuta*, 281 U. S. 138, 142–143 (1930) (State may not revoke its consent to exercise of jurisdiction by the United States).

[17] Although the question of revocability did not arise during the Senate debates, the Senate's brief discussion of the gubernatorial-consent provision suggests that consent, once obtained, was expected to remain effective for as long as necessary. Senator Magnuson commented that he could not "conceive of any acreage of wetlands that it is intended to purchase in the next 3 or 4 years that has not already had the joint approval of all the States and everyone else involved." 107 Cong. Rec. 17172 (1961). Senator Hruska, a member of the Migratory Bird Conservation Commission, confirmed that when the Commission met to approve land acquisitions, "[t]here has already been processed before that time the area of agreement between the Federal agencies and the State agencies which makes the approval possible." *Ibid.* Senators Magnuson and Hruska each envisioned precisely the sequence of events that has occurred here: the United States would develop a general plan for the acquisition of wetlands, the plan would be submitted to the Governor or appropriate state agency for ap-

314

In the absence of any evidence to the contrary, we must conclude that the consent required by § 715k–5 cannot be revoked at the will of an incumbent Governor.  To hold otherwise would be inconsistent with the very purpose behind the Loan Act of which § 715k–5 is a part.  The Loan Act was expressly intended to facilitate the acquisition of wetlands by making available an additional source of funds.  The legislative history is replete with references to the need to preserve the Nation's wetlands by bringing four to five million additional acres under federal control.  See Hearings on S. 2187 et al. before the Merchant Marine and Fisheries Subcommittee of the Senate Committee on Commerce, 87th Cong., 1st Sess., 14–19, 23–24, 28–31, 33–39 (1961); S. Rep. No. 705, 87th Cong., 1st Sess., 2 (1961); H. R. Rep. No. 545, 87th Cong., 1st Sess., 1–2 (1961).  Obviously, this acquisition could not take place overnight; careful planning over many years was anticipated.  See S. Rep. No. 705, *supra*, at 2.  If consent under § 715k–5 were revocable, the United States' ability to engage in such planning would be severely hampered.  A detailed federal program involving the estimate of needs, setting of priorities, allocation of funds, and negotiations with landowners could be negated in an instant by a Governor's decision that the politics of the moment made further federal acquisitions undesirable.

Our conclusion in this regard is strengthened by the fact that, at the time of its enactment, the gubernatorial-consent provision was not at all controversial.  It was added by the Senate Committee on Commerce without explanation, see S. Rep. No. 705, *supra*, at 3, and was accepted by the House of Representatives without explanation or discussion, see H. R. Conf. Rep. No. 1184, 87th Cong., 1st Sess., 1 (1961); 107 Cong. Rec. 21184 (1961).  The only discussion of the pro-

---

proval, and, if approval was given, the United States would proceed to acquire wetlands pursuant to that approval—over the course of years, if need be.

vision came on the Senate floor, when that body was assured that it did no more than formalize the existing practice of gaining state approval prior to acquiring land. We are unwilling to assume that Congress, while expressing its firm belief in the need to preserve additional wetlands, so casually would have undercut the United States' ability to plan for their preservation. Clearly, Congress intended the States to play an important role in the planning process. But once plans have been made and the Governor's approval has been freely given, the role of the State indeed is at an end. It is then up to the United States to choose how best to use its resources in putting its acquisition plans into effect.

Although it has been intimated that a Governor's consent might become revocable if the United States were to delay unreasonably its land acquisitions pursuant to the consent, see Brief for United States 26; Tr. of Oral Arg. 35, we need not reach that issue here. In this case, there has been no unreasonable delay. Until North Dakota's legislation interfered in 1977, the United States had pursued diligently its program of acquiring wetlands easements in North Dakota. The acreage fluctuated somewhat from year to year, but the acquisitions each year were substantial.[18] In 1958, when Congress first authorized the Secretary of the Interior to acquire waterfowl production areas, it was generally anticipated that the United States' acquisition program would take a minimum of 20 to 25 years to complete.[19] The acquisition

---

[18] See United States Dept. of the Interior, Annual Report of Lands Under Control of the U. S. Fish and Wildlife Service (1974–1977) (Table 4, Waterfowl Production Areas); United States Dept. of the Interior, Annual Report of Lands Under Control of the Bureau of Sport Fisheries and Wildlife (1961–1973) (Table 4, Waterfowl Production Areas).

[19] See, e. g., H. R. Rep. No. 2182, 85th Cong., 2d Sess., 2 (1958); Hearings on H. R. 12006 before the Subcommittee on Fisheries and Wildlife Conservation of the House Committee on Merchant Marine and Fisheries, 85th Cong., 2d Sess., 5 (1958) (statement of Rep. Reuss); id., at 26 (testimony of Ross Leffler, Assistant Secretary for Fish and Wildlife, Dept. of

program had been underway for only 16 years in 1977, a time-span well within the limits contemplated by Congress.

B

We next consider North Dakota's 1977 legislation, which purports to impose conditions on the United States' power to acquire further wetlands easements. Because the statutes at issue raise somewhat different concerns, we discuss each in turn.

1. *N. D. Cent. Code § 20.1–02–18.1 (Supp. 1981).* This statute sets out certain conditions that must be met "prior to final approval" of the acquisition of wetlands easements. The only sanction provided in § 20.1–02–18.1 for failure to comply with its conditions is that consent for the acquisitions will be refused. North Dakota explains that this represents the State's decision "to qualify or condition any consent to future acquisitions." Brief for Appellant 33; see *id.*, at 35.

We thus need not consider in this case whether the gubernatorial-consent provision, 16 U. S. C. § 715k–5, permits North Dakota to impose these conditions on any consent it chooses to give in the future.[20] At issue here is the status of

---

the Interior); *id.*, at 37 (statement of Daniel H. Janzen, Director of Bureau of Sport Fisheries and Wildlife, Dept. of the Interior); *id.*, at 47 (statement of Rep. Metcalf); Hearings on S. 2447 et al. before a Subcommittee of the Senate Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess., 85 (1958) (comments of Sen. Magnuson).

JUSTICE O'CONNOR finds this legislative history unpersuasive, primarily because the gubernatorial-consent provision was not added until 1961, three years after initial authorization of the acquisition of land for waterfowl production areas. *Post*, at 322. But as we have explained *supra*, at 313, the gubernatorial-consent provision was intended merely to formalize the prior practice of obtaining consent prior to the acquisition of any land under the Stamp Act.

[20] Compare *United States* v. *Williams*, 302 U. S. 46, 50 (1937) (federal statute, requiring parental consent prior to minor's enlistment, does not confer right to impose conditions on consent), with, *e. g.*, *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 146–147 (1937) (Article I, § 8, cl. 17, of

acquisitions authorized by consents already given. We do not understand the State to argue that § 20.1–02–18.1 imposes retroactive conditions on these prior consents. By its terms, the statute has no application to the acquisition of easements for which consent previously has been given, because nothing in the statute purports to limit the United States' power to acquire land once "final approval" has been obtained. Moreover, any attempt to impose retroactive conditions clearly would be unavailing. We have ruled above that once the requisite gubernatorial consent has been obtained, it may not be revoked. Since 16 U. S. C. § 715k–5 does not permit North Dakota to revoke its consent outright, North Dakota may not revoke its consent based on noncompliance with the conditions set forth in N. D. Cent. Code § 20.1–02–18.1 (Supp. 1981).

2. *N. D. Cent. Code § 20.1–02–18.2 (Supp. 1981)*. The United States does not challenge those portions of § 20.1–02–18.2 that permit a landowner to negotiate the conditions of an easement and restrict the scope of the easement to a particular legal description. The United States does object, however, to that part of § 20.1–02–18.2(2) that permits a landowner to "drain any after-expanded wetland or water area in excess of the legal description in the . . . easement . . . ." The United States' standard easement agreement contains a clause prohibiting the draining of after-expanded wetlands, see n. 6, *supra*, and § 20.1–02–18.2(2) might be read to void such clauses even when agreed to by the landowner.

This Court addressed a similar situation in *United States* v. *Little Lake Misere Land Co.*, 412 U. S. 580 (1973). In that case, the United States had exercised its authority under the Conservation Act to acquire land in Louisiana for use as a wildlife refuge. Mineral rights were reserved to the prior

Constitution, requiring state consent prior to assumption of federal jurisdiction over land, does confer right to impose conditions on consent).

landowners for a period of 10 years, subject to extensions under certain conditions. A Louisiana statute barred the reversion of the mineral rights to the United States, and thus in effect extended the prior landowners' mineral rights indefinitely.

Applying *Clearfield Trust Co.* v. *United States,* 318 U. S. 363 (1943), this Court concluded that because the United States' acquisition of land under the Conservation Act "is one arising from and bearing heavily upon a federal regulatory program . . . , the choice-of-law task is a federal task for federal courts." 412 U. S., at 592. The key factors in *Little Lake Misere* were that "[w]e deal[t] with the interpretation of a land acquisition agreement (a) explicitly authorized, though not precisely governed, by the Migratory Bird Conservation Act and (b) to which the United States itself [was] a party." *Id.,* at 594. Although the present case involves acquisitions under the Stamp Act rather than the Conservation Act, the federal interests at stake are the same. Thus, the choice of applicable law presents a federal question. Although state law may be borrowed if appropriate, "specific aberrant or hostile state rules do not provide appropriate standards for federal law." *Id.,* at 596.

Because the Louisiana statute at issue in *Little Lake Misere* was "plainly hostile to the interests of the United States," *id.,* at 597, the Court refused to apply it. In language equally applicable to the present case, the Court said:

"To permit state abrogation of the explicit terms of a federal land acquisition would deal a serious blow to the congressional scheme contemplated by the Migratory Bird Conservation Act and indeed all other federal land acquisition programs. These programs are national in scope. They anticipate acute and active bargaining by officials of the United States charged with making the best possible use of limited federal conservation appropriations. Certainty and finality are indispensable in

any land transaction, but they are especially critical when, as here, the federal officials carrying out the mandate of Congress irrevocably commit scarce funds." *Ibid.*

To the extent that § 20.1–02–18.2(2) authorizes landowners to drain after-expanded wetlands contrary to the terms of their easement agreements, we must conclude that it is equally hostile to federal interests and may not be applied to easements acquired under previously given consents.[21] The United States is authorized to incorporate into easement agreements such rules and regulations as the Secretary of the Interior deems necessary for the protection of wildlife, 16 U. S. C. § 715e, and these rules and regulations may include restrictions on land outside the legal description of the easement. See *Kleppe* v. *New Mexico*, 426 U. S. 529, 546 (1976); *Camfield* v. *United States*, 167 U. S. 518, 525–526 (1897). To respond to the inherently fluctuating nature of wetlands, the Secretary has chosen to negotiate easement agreements imposing restrictions on after-expanded wetlands as well as those described in the easement itself. As long as North Dakota landowners are willing to negotiate such agreements, the agreements may not be abrogated by state law.[22]

3. *N. D. Cent. Code § 47–05–02.1 (1978).* Much the same analysis persuades us that this statute, which limits nonap-

---

[21] Because this case concerns only the acquisition of easements under consents already given, we need not decide whether § 20.1–02–18.2(2) could be applied to easements acquired under consents North Dakota may choose to give in the future. See n. 20, *supra.*

[22] *United States* v. *Burnison*, 339 U. S. 87 (1950), on which North Dakota relies, is not to the contrary. In *Burnison*, the Court held that a State's traditional power to control the testamentary transfer of property included the power to prohibit testamentary gifts to the United States. The Court stated specifically that its holding did not "affect the right of the United States to acquire property by purchase or eminent domain in the face of a prohibitory statute of the state." *Id.*, at 93, n. 14; see *United States* v. *Fox*, 94 U. S. 315, 320 (1877).

purtenant easements to a maximum term of 99 years, may not be applied to wetlands easements acquired by the United States under consents previously given pursuant to the Stamp Act.[23]  The United States' commitment to the protection of migratory birds will not cease after 99 years have passed.  This commitment has been incorporated into law for over 80 years and has been expressed in treaties since 1916, and the need to preserve migratory bird habitats is now no less than before.

To ensure that essential habitats will remain protected, the United States has adopted the practice of acquiring permanent easements whenever possible.  Permanent easements are authorized by the gubernatorial consents given from 1961 to 1977,[24] and the United States apparently has had no difficulty in negotiating permanent easements with North Dakota landowners.  The automatic termination of federal wetlands easements after 99 years would make impossible the "[c]ertainty and finality" that we have regarded as "critical when . . . federal officials carrying out the mandate of Congress irrevocably commit scarce funds." *United States* v. *Little Lake Misere Land Co.*, 412 U. S., at 597.  We conclude that § 47–05–02.1 is hostile to federal interests and may not be applied.  See 412 U. S., at 596; *United States* v. *Albrecht*, 496 F. 2d 906, 911 (CA8 1974).

### III

The District Court and the Court of Appeals held that gubernatorial consent was not required prior to federal acqui-

---

[23] Although N. D. Cent. Code § 47–05–02.1 (1978) applies to all nonappurtenant easements, it was apparently enacted in response to dissatisfaction with the United States' acquisition of permanent easements over wetlands.  See Report of the Committee on Agriculture submitted to the North Dakota Legislative Council (Nov. 1976), reprinted at Record 22, 26; App. 39.

[24] We need not decide whether future consents could be limited so as to authorize the acquisition of 99-year easements only, or whether § 47–05–02.1 could be applied to easements acquired under consents given in the future.  See nn. 20 and 21, *supra.*

sition of wetlands easements, and that North Dakota's 1977 legislation could not be applied to any easements acquired under the Stamp Act. We conclude that although gubernatorial consent is required, it has been given here and cannot be revoked. We also conclude that North Dakota's 1977 legislation cannot restrict the United States' ability to acquire easements pursuant to consent previously given. To this extent, we affirm the judgment below.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE REHNQUIST joins, concurring in part and dissenting in part.

I agree with the Court that gubernatorial consent is required for the acquisition of wetlands easements, that the required consent was given in this case, and that North Dakota may not simply revoke its consent at will. I disagree with the Court, however, in its holding that the United States acquired its easements pursuant to the consents within a reasonable time as a matter of law. I would remand this case in order to allow the lower courts an opportunity to determine whether the Federal Government delayed unreasonably in making its acquisitions. Because I would remand, and because I believe that the Court decides another issue that is not properly before the Court, I dissent in part.

First, in its brief, the Government concedes that "Congress must have assumed that the Secretary would be able to rely on the continued effectiveness—*at least for a reasonable period of time*—of gubernatorial consents." Brief for United States 26 (emphasis added).[1] The Government's concession on this point reflects the position, correct in my view, that Congress did not intend that gubernatorial consents, once given, could never be withdrawn even if the United States failed to acquire its easements within a reasonable time. Although there is virtually no legislative history concerning the consent provision in 16 U. S. C. § 715k–5, the provision rep-

---

[1] See also Brief for United States 14, 27; Tr. of Oral Arg. 35, 41.

resents an attempt to give to the States a meaningful right to control to some extent federal acquisition of easements in light of the unquestioned federal authority to take the land through condemnation procedures.[2] See *Paul* v. *United States*, 371 U. S. 245, 264 (1963). Congress surely did not intend to bind the States forever by their consents if the Federal Government failed to act on them. Permanent irrevocable consents would frustrate legitimate state land use planning just as consents revocable at will would frustrate federal protection of migratory wildfowl. Therefore, I agree with the position taken by the United States that the State's consent is irrevocable for a reasonable time after the consent is given.

The Court finds it unnecessary to decide whether the consent is revocable after the lapse of a reasonable time because it concludes that a reasonable time has not elapsed in this case. The Court bases this factual judgment primarily on statements in the legislative history indicating that Congress anticipated that the wetlands "acquisition program would take a minimum of 20 to 25 years to complete." *Ante*, at 315 (footnote omitted). Although the Court correctly points out that such statements appear in the House Report and various hearings concerning the 1958 amendment to the Stamp Act, those statements cannot be used to show that, in adding the gubernatorial-consent provision *in 1961*, Congress intended consent to be irrevocable for the period necessary to complete all previously described acquisition objectives regardless of its duration. The Court merely assumes that the estimated time period for completing the acquisition program generally is a "reasonable time" for purposes of determining whether the Government has acted reasonably in exercising

---

[2] The only explicit reference to the consent provision is made by Senator Magnuson, who stated that there could be no acquisition "unless the Federal Government and the State involved had a complete agreement . . . as to the nature of the lands and the acreage involved." 107 Cong. Rec. 17171 (1961).

its consents in this particular case. There is nothing in the legislative history of either the 1958 amendment to the Stamp Act, or the 1961 addition of the consent provision, to support the Court's conclusion on this point.

The Court acknowledges that the acquisition program involved in this case had been underway for 16 years by the time the Government ceased its acquisitions as a result of the state legislation that is in issue. This time period is not, in my view, "reasonable" *as a matter of law*, and I would remand the issue in order to give the courts below an opportunity to decide whether the Federal Government acted reasonably in this case.

Second, for the first time in this Court, North Dakota argues that even if it may not revoke its consent to easement acquisition, the United States has already acquired easements over acreage in excess of the consents that were given. The Court resolves this dispute by holding that North Dakota's argument fails because "the easement agreements make clear . . . [that] the restrictions apply only to wetlands areas not to the entire parcels. . . . The fact that the easement agreements include legal descriptions of much larger parcels does not change the acreage of the wetlands over which easements have been acquired." *Ante*, at 311–312, n. 14.

This issue clearly was not raised below. In its complaint filed in the District Court for North Dakota, the United States stated that its total easement acreage to date in North Dakota was 764,522 acres. App. 31. This claim was repeated in answers to North Dakota's interrogatories. *Id.*, at 49. North Dakota never challenged that claim, and stipulated that the District Court had been provided with all evidentiary material necessary to resolve the cross-motions for summary judgment concerning the necessity for, and revocability of, gubernatorial consent. *Id.*, at 71–73. Indeed, North Dakota stipulated that its position was that the consent had been revoked, and that the particular guberna-

torial consents were themselves legally inadequate for easement acquisition. *Id.*, at 71–72. Therefore, the issue concerning exhaustion of consent was not raised below, and is not properly before the Court in this case.

Because I would remand to enable the lower courts to determine whether the United States acted reasonably in obtaining its wetlands easements, and because the Court decides an issue that is not, in my view, properly before the Court, I am unable to join the Court's opinion in its entirety.