In re WATER RIGHT CLAIM NO. 1927–2; Water Permit Application No. 1921–2; and Water Permit Application No. 2192–2.

Wendell DeKAY, Charles Emley, Brett Heath, Raymond Kocer, and Lawrence Kocer, Petitioners and Appellants,

v.

UNITED STATES FISH AND WILD-LIFE SERVICE, Applicant and Appellee,

and

Water Rights Division, State of South Dakota, Appellee.

No. 18708.

Supreme Court of South Dakota.

Argued Oct. 18, 1994.

Decided Dec. 7, 1994.

Rehearing Denied Jan. 6, 1995.

Jane M. Farrell and Patrick M. Ginsbach of Farrell, Farrell and Ginsbach, Hot Springs, for appellants.

Mikal G. Hanson, Asst. U.S. Atty., Pierre, and John R. Kunz, U.S. Dept. of Interior, Office of the Solicitor, U.S., Denver, CO, for applicant and appellee.

Mark Barnett, Atty. Gen., Diane Best, Asst. Atty. Gen., Pierre, for appellee, State.

SABERS, Justice.

Landowners appeal circuit court's decision affirming Water Board's grant of water use permits to United States Fish and Wildlife Service in LaCreek National Wildlife Refuge. We affirm.

### FACTS

The United States Fish and Wildlife Service (FWS) owns and operates the LaCreek National Wildlife Refuge (Refuge) in Bennett County, South Dakota. The Refuge was established by Presidential Order in 1935. In September of 1971, FWS purchased 6,665 acres of land known as the "Brown Ranch" which was contiguous to the Refuge. The Brown Ranch land is used for shallow water habitat for migratory waterfowl.

FWS applied for three water right permits to the South Dakota Water Management Board (Board).

1. The First, No. 1927–2, was a request to vest a prior claimed right to 10 cubic

feet per second of water from four diversion points on Lake Creek.

2. The Second, No. 2191–2, was for a new water right to the natural flow of water from six springs near Lake Creek. FWS did not plan any development of the springs; the application was to assure the continued flow of the springs if the flow decreased due to use by others. This water was to be used to maintain 235 acres of marshes, sloughs, and wet meadows for wildlife habitat.

3. The Third, No. 1921–2, was to change the point of diversion and some of the land irrigated from Cedar Creek under an existing permit. A dam authorized as the diversion point was breached and no longer functioning. FWS sought to amend its permit to use another dam approximately one-half mile away as the diversion point.

Board granted FWS the three permits on the condition that FWS' use of water did not flood or impair the surrounding Landowners' property. Landowners appealed the Board's decision to the circuit court, which found that Landowners' main complaint was the flooding of their land by FWS' use of its permits. This flooding allegedly caused the drowning of natural grasses used for commercial hay production and livestock and replaced it with commercially non-viable marsh-type vegetation. Landowner Wendell DeKay alleges the quality of water discharged onto his property has diminished as a result of the increased carp population in FWS' sloughs.

The circuit court reversed the First permit because insufficient evidence existed that Brown Ranch had been using 10 c.f.s. of water from the diversion points, but affirmed Board's grant of the Second and Third permits. Landowners appeal the circuit court's ruling on the Second and Third permits.

■ Landowners appeal the Board's findings of fact which we review under the clearly erroneous standard. The decision is

to be upheld unless the reviewing Court is left with a definite and firm conviction that a mistake has been committed. *Fraser v. Water Rights Commission*, 294 N.W.2d 784 (S.D.1980). Mixed questions of fact and law are reviewed for error without deference. *Permann v. Dept. of Labor, Unemp. Ins. Div.*, 411 N.W.2d 113, 119 (S.D.1987).

### THE SECOND PERMIT

#### A. Future use

■ FWS sought the right to the continued natural flow of six springs if the water table dropped due to conditions or use by others. Landowners argue that the Second permit would improperly reserve a future use by protecting against future diminution. Under SDCL 46–5–38, only a few enumerated agencies may reserve future water rights. FWS concedes that it is not one of the statutorily enumerated agencies. The springs' natural flow was intended for current use to maintain 235 acres of marshes and other waterfowl habitat. Although FWS did not intend to divert any of the natural flow,[1] the court found that the use was current and that the permit was not granted for an impermissible future use. Landowners have not shown this to be error.

#### B. Impairment of Rights

SDCL 46–2A–9 governs water right permits:

A permit to appropriate water may be issued only if there is reasonable probability that there is unappropriated water available for the applicant's proposed use, that the proposed diversion can be developed without unlawful impairment of existing rights and that the proposed use is a beneficial use and in the public interest.

Landowners contend that the Second permit would impair the quality of water flowing to DeKay's property and the quantity of

---

1. Refuge Manager Rolf Kraft testified "we [FWS] are using the water that naturally comes out of the springs. If that water flow diminished that would impact how we use our water." FWS sought the permit to protect and maintain its current water right.

water reaching Hines' property. The court found that the permit would not change existing natural conditions and that it would not impair the quality of water reaching De-Kay's property or the quantity of water reaching Hines' property. Landowners have failed to show that the finding was erroneous.

## C. Beneficial Use

SDCL 46–2A–9 also requires that the permit constitute a "beneficial use." Under SDCL 46–1–6(3), a "beneficial use" is:

> any use of water within or outside the state, that is reasonable and useful and beneficial to the appropriator, and at the same time is consistent with the interests of the public of this state in the best utilization of water supplies[.]

■ A two-part analysis is required to determine "beneficial use." First, the use must be "reasonable, useful, and beneficial to the appropriator." SDCL 46–1–6(3). Landowners argue that because duck production declined on the refuge from 1983 to 1990,[2] the use for waterfowl habitat is no longer a beneficial use for the Refuge. The court found that the habitat provides for a "nationally significant population of trumpeter swans, and for Canada geese, snow geese, blue geese, cranes, and other wildlife." The court concluded that "[p]ropagation of all these species is reasonable, useful and beneficial to FWS and the public."

Landowners cite *Lake Shore Duck Club v. Lake View Duck Club*, 50 Utah 76, 166 P. 309 (1917), for the proposition that appropriating water for cultivating food for wildlife and waterfowl is not a beneficial use. However, the weight of authority indicates that "beneficial use is an evolving concept, and a concept that can be expanded to reflect changes in society's recognition of the value of new uses of our resources." Rick A. Thompson, *Statutory Recognition of Instream Flow Preserva-*

*tion: A Proposed Solution for Wyoming*, 17 Land & Water L.Rev. 139, 143 (1982). Appropriation of water for waterfowl habitat and other wildlife is a beneficial use. ARSD 74:03:04:01 ("All streams in South Dakota are assigned the *beneficial uses* of irrigation and *wildlife propagation* and stock watering.") (emphasis added); *State v. Morros*, 104 Nev. 709, 766 P.2d 263, 268 (1988). The protection of migratory birds and their habitat is in the "national interest." *North Dakota v. United States*, 460 U.S. 300, 309, 103 S.Ct. 1095, 1101, 75 L.Ed.2d 77 (1983). A series of treaties signed by the United States starting in 1916 "obligates the United States to preserve and protect migratory birds through the regulation of hunting, the establishment of refuges, and the protection of bird habitats." 460 U.S. at 309–10, 103 S.Ct. at 1101, 75 L.Ed.2d 77. It was not error to conclude that maintenance and protection of waterfowl habitat was a beneficial use by FWS.

■ Landowners also contend that the proposed use will not be reasonable, useful, or beneficial because the area is already subirrigated by a high water table. The court found that natural precipitation is not dependable and that dependable water is required to provide for continuous growth of aquatic plants and insects, and to provide habitat needed for critical periods of wildlife development. The court concluded that FWS established that it is reasonable, necessary, and beneficial for FWS to have uninterrupted use of water. Landowners have not shown this to be error.

■ Landowners also argue that the land is not suitable for traditional commercial irrigation because of the type of soil in the area. They argue that no beneficial use exists because water used for a wildlife refuge is not "irrigation" and only "irrigation" constitutes a beneficial use. The Board found and the court agreed that a beneficial use existed even though the crops are not harvested by

---

2. FWS' figures indicate that duck production on the Refuge declined from 12,915 in 1983 to 1,360 in 1990. Rolf Kraft, Refuge manager, blames part of this decrease on the rising carp population which is muddying the water, making it less

suited for aquatic plant growth. However, the Board and the circuit court agreed that this decrease was not indigenous to the LaCreek Refuge and duck production has declined across the nation.

human beings but by migratory birds and wildlife.

The court held that a beneficial use from irrigation is not limited to raising traditional cash crops. Under ARSD 74:02:01:01(4), "irrigation" is providing moisture for *any* "plant growth." The court concluded that even if it were not an "irrigation" use, it is a beneficial use. Under ARSD 74:03:04:01, the use of water for aquatic plant growth for wildlife propagation is a beneficial use whether or not it constitutes "irrigation."

■ Secondly, SDCL 46–1–6(3) requires that the use must be in the public interest to be deemed a "beneficial use." Landowners contend that the permit is not in the public interest because FWS' past use of water has caused flooding of their land. The court found that the Board provided for the public interest. Board granted the permit subject to qualification. Under SDCL 46–1–14, the Board may issue any permit or license "subject to terms, conditions, restrictions, qualifications, quantifications or limitations [ ] which it considers necessary to protect the public interest[.]" Board issued the Second permit with the following qualification:

> Use of water authorized by this permit may not impair the use of any lands adjoining the LaCreek National Wildlife Refuge including, but not limited to, flooding or specific alteration of plant species directly attributable to water use under this permit. Flooding of adjoining land may occur if a written flood easement is obtained from the property owner or owners.

Board's Finding of Fact LXIV.

The court concluded that Landowners' public interest argument was misplaced because they failed to show that the Second permit would change or cause any flooding that did not occur naturally. Landowners have not shown this to be error.

## THE THIRD PERMIT

■ Under SDCL 46–5–34, amendment of a water permit is allowed when "it should become impracticable to use all or any part of the water beneficially or economically for irrigation of any land to which the right of its use is appurtenant[.]" Landowners claim that FWS made no showing that appropriation from the old dam, the initial diversion point, was impracticable. They claim that the breach of the old dam is not a sufficient showing of impracticability. FWS presented evidence that the costs of constructing a new dam at the same diversion point would be $750,000. The Board found and the court affirmed that use of this original diversion point would be made "impracticable" by the necessity that a new dam be built. Landowners have not shown that amendment of the permit to allow a new diversion point was improper.

■ Landowners also argue that a permit may be amended only if the new land is appurtenant to the old land or the water source. Landowners appear to argue that "appurtenancy" requires that the new land must be contiguous to the property in the original permit. SDCL 46–5–34 provides:

> All water used in this state for irrigation purposes shall remain appurtenant to the land upon which it is used. However, if for any reason it should become *impracticable to use all or any part of the water beneficially or economically for irrigation of any land to which the right of its use is appurtenant,* all or any part of the right may be severed from the land and simultaneously transferred and *become appurtenant* to other land without losing priority of right previously established, subject to existing rights, upon approval of an application for an amended permit. No increase in total acres irrigated may be allowed under this section.

*Id.* (emphasis added). The court correctly concluded the statute imposes no requirements that the original and the new property be contiguous.

■ Landowners contend that use of water under the Third permit would impermissibly amend an "irrigation" use into a nonirrigation use. The Board found that the use

of the water under the Third permit would provide habitat for waterfowl, including sloughs and marshlands with plant growth essential for waterfowl survival and propagation. Under ARSD 74:02:01:01(4), the use remains for "irrigation" by providing moisture for plant growth. The court affirmed the Board on this point and no error is shown.

We affirm.

MILLER, C.J., and WUEST, AMUNDSON and KONENKAMP, JJ., concur.