#30795, #30796, #30822, #30823-a-JMK
**2025 S.D. 53**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

#30795, #30822

IN THE MATTER OF
MCCOOK LAKE RECREATION AREA ASSOCIATION'S
PETITION FOR DECLARATORY RULING REGARDING
APPROPRIATIVE PERMITS AND SHORELINE ALTERATIONS

---

IN THE MATTER OF WATER PERMIT
APPLICATION NO 8744-3,
DAKOTA BAY, LLC

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

#30796, #30823

IN THE MATTER OF
MCCOOK LAKE RECREATION AREA ASSOCIATION'S
PETITION FOR DECLARATORY RULING REGARDING
APPROPRIATIVE PERMITS AND SHORELINE ALTERATIONS

---

IN THE MATTER OF WATER PERMIT
APPLICATION NO 8744-3,
DAKOTA BAY, LLC

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
UNION COUNTY, SOUTH DAKOTA

* * * *

ARGUED
APRIL 29, 2025
OPINION FILED **09/24/25**

\* \* \* \*

THE HONORABLE TAMI BERN
Judge

\* \* \* \*

JOHN M. HINES
DAVID C. BRIESE of
Crary Huff, P.C.
Sioux City, Iowa

Attorneys for appellant McCook Lake Recreation Area Association.

MARTY J. JACKLEY
Attorney General

JENNIFER L. VERLEGER
Assistant Attorney General
Pierre, South Dakota

Attorneys for appellee South Dakota Chief Engineer and Water Rights Program.

STACY R. HEGGE of
Gunderson, Palmer, Nelson
   & Ashmore, LLP
Pierre, South Dakota

DEAN A. FANKHAUSER of
Tigges, Bottaro & Lessmann, LLP
Sioux City, Iowa

Attorneys for appellees Dakota Bay, LLC and Michael Chicoine.

#30795, #30796, #30822, #30823

KERN, Justice

[¶1.] Dakota Bay, LLC, owns a number of lots adjacent to McCook Lake in Union County. Michael Chicoine, the owner of Dakota Bay, planned to construct an 1,800-foot-long, 110-foot-wide canal extending across his property to connect to the southeast corner of McCook Lake. To begin this project, Chicoine first applied to South Dakota Game Fish and Parks (GF&P) for a shoreline alteration permit. After consultation with GF&P, Chicoine applied for a permit to appropriate water from an existing irrigation well on his property (the well permit) to initially fill and maintain the water level in the canal which would be lined with an 18-inch fat clay liner. After learning of Chicoine's plans, the McCook Lake Recreation Area Association (Association) filed a petition with the South Dakota Department of Agriculture and Natural Resources (DANR) Water Management Board (Board) seeking a declaratory ruling that Chicoine and Dakota Bay must apply for and obtain a permit to appropriate water from McCook Lake before obtaining a shoreline alteration permit. The Association also opposed Dakota Bay's application for the well permit.

[¶2.] After a hearing, the Board granted Chicoine/Dakota Bay's well permit application and denied the Association's petition for declaratory ruling. The Association appealed both decisions to the circuit court and the court issued a memorandum opinion affirming the Board's decisions. The Association appealed and during oral argument before this Court, the parties agreed that the cases should now be consolidated. We agree and render a consolidated opinion.

## Factual and Procedural History

[¶3.]        McCook Lake is an oxbow of the Missouri River located in Union County.  The soil in several places around the lake is prone to substantial leaching, causing the lake to lose much of its water throughout the year.  To combat the water loss, the Association holds a water right and water permit to pump water from the Missouri River into McCook Lake from March 1 through December 1 each year to raise and maintain its water levels.[1]  Through a pumping pipeline system built and maintained by the Association, it can pump up to 12,000 gallons per minute of water directly from the Missouri River into McCook Lake.

[¶4.]        Chicoine submitted an application for a shoreline alteration permit to GF&P on December 31, 2021, seeking to build a waterway extending south "from McCook Lake in order to provide lake access to existing residential lots, future lots to be developed and the potential relocation of the McCook Lake Boat Ramp for the city of North Sioux City, SD."  The project entailed:

> [E]xcavat[ing] a waterway (canal) having a 90-foot wide water surface to allow for 2-way no-wake boat travel to and from residential lots and the proposed relocated boat ramp.  Proposed water depth of 8.0 feet with a flat bottom and 2:1 side slopes.  Possible private boat docks on both sides leaving a boat travel width of about 46 feet. . . . The excavated area will consist of an 11-foot deep, 110-foot wide canal that is approximately 1,800 feet in length.

---

1.      Water Right No. 5878A-3 authorizes the Association to appropriate 12.89 cubic feet of water per second (cfs) from the Missouri River.  Water Permit No. 6479-3 added an additional appropriation of 13.85 cfs for a total appropriation of 26.7 cfs.  In addition to the temporal restrictions on the Association's right to pump, it can only appropriate water if the water level of the Missouri River is sufficiently high and when the water elevation of McCook Lake falls below the ordinary high-water mark of 1,090.3 feet above mean sea level (fmsl).

[¶5.] The Association learned of Chicoine's shoreline alteration application and filed a petition for a declaratory ruling with the Board pursuant to SDCL 1-26-15 and ARSD 74:02:01:46 on March 10, 2023, seeking a declaration "that the alteration of a public water body by a private party requires a permit for appropriation of water[.]" In an accompanying letter to the Board, the Association explained that it believed the construction of the canal would cause higher rates of leaching and evaporation and that the canal would appropriate water from McCook Lake "to meet the evaporation and seepage los[s]es from the Canal." The Association also asserted that it did not have the funds or pumping capacity to fill the canal and lake in dry years.

[¶6.] Due to the porous soil type in the area of the proposed canal, GF&P recommended that Chicoine install a clay liner in the canal to prevent or minimize water loss. However, GF&P expressed concern that if the water level in the canal fell and the clay liner was exposed, it could dry out, which could cause the liner to crack or float. In response, Chicoine proposed that he could use water from an existing irrigation well on his land to initially fill the canal and maintain a water level sufficient to prevent the liner from drying out.[2] To do so, Chicoine applied for the well permit (Water Permit Application No. 8744-3) seeking a one-time appropriation of 20.61 acre-feet of water to initially fill the canal and 7.99 acre-feet of water annually to ensure the liner remains wet. GF&P decided to hold Chicoine's

---

2. Chicoine holds Water Permit No. 6557-3, allowing him to appropriate water from the well to irrigate 60 acres of farmland. GF&P consulted with the DANR Water Rights Program and informed Chicoine that he would need to obtain a new water appropriation permit to use the irrigation well water for a new purpose.

shoreline alteration application in abeyance pending the resolution of his well permit application.

[¶7.]     In support of his application, Chicoine provided the calculations performed by Dakota Bay's engineer, Scott Gernhart, detailing the amount of water needed to fill the canal and the estimated amount of water needed to replace water lost through evaporation and seepage.[3]  Gernhart's explanatory comments also indicate that he did not account for rainfall in his calculations and that less water may be required in some years based on the amount of rainfall actually received.  At a flow rate of 1.55 cubic feet per second, Gernhart calculated that the canal could be filled after 9.3 days of continuous pumping from the irrigation well.

[¶8.]     Nakaila Steen, a Natural Resources Engineer with the DANR Water Rights Program,[4] prepared a report assessing the availability of water for the canal. The irrigation well draws water from the Missouri: Elk Point aquifer which "is

---

3.    Gernhart calculated that it would take 7.90 acre-feet of water to replace water lost to evaporation and .09 acre-feet of water to replace water lost to seepage each year.

4.    The Water Rights Program operates under DANR and is responsible for monitoring the state's surface and ground water levels. *See Organization*, South Dakota Dep't of Agriculture & Natural Resources, https://danr.sd.gov/OfficeOfWater/WaterRights/default.aspx (last visited Sep. 16, 2025).  In the permitting process, the Water Rights Program helps applicants complete their applications, prepares public notices, and calculates the amount of water available for appropriation. *Id.*  The chief engineer of the Water Rights Program makes a recommendation to approve, defer, or deny each application.  Contested cases are set for a hearing before the Board, which is a "quasi-judicial citizen's board consisting of seven members appointed by the Governor." *Application and Hearing Procedures*, South Dakota Dep't of Agriculture & Natural Resources, https://danr.sd.gov/OfficeOfWater/WaterRights/PermitForms/HearingProced ures.aspx (last visited Sep. 16, 2025); SDCL 1-41-15 (creating the Water Management Board).

hydrologically connected to the Big Sioux, Lower Vermillion-Missouri and Lower James-Missouri aquifers, and the Big Sioux, James, Missouri, and Vermillion Rivers[.]" Steen calculated that the aquifer's annual recharge rate would exceed its average annual withdrawal rate and, therefore, concluded that "there is a reasonable probability unappropriated water is available from the Missouri: Elk Point aquifer for the proposed appropriation." Steen also evaluated whether the appropriation requested in Chicoine's application would unlawfully impair the rights of other water rights permit holders authorized to draw water from the Missouri: Elk Point aquifer. After considering the saturated thickness of the aquifer, the unconfined nature of the aquifer at the well location, and the absence of prior well interference complaints from other users of the aquifer in the area, Steen concluded that the proposed appropriation "will not impose unlawful impairments on existing users with adequate wells."[5]

[¶9.] The Chief Engineer of the Water Rights Program, Eric Gronlund, recommended that the Board approve Application No. 8744-3 subject to the following qualifications:

> 1. The well approved under Water Permit No. 8744-3 is located near domestic wells and other wells which may obtain water from the same aquifer. Water withdrawals shall be controlled so there is not a reduction of needed water supplies in adequate domestic wells or in adequate wells having prior water rights.

---

5. Steen later testified that an "adequate well" is "[a] well that is capable of allowing the inlet of a pump to be placed 20 feet into the saturated aquifer material, and if there is not 20 feet present, as near to the bottom as possible."

2.  The Permit holder shall report to the Chief Engineer annually the amount of water withdrawn from the Missouri: Elk Point aquifer.

3.  Water Permit No. 8744-3 authorizes a total diversion of up to 28.6 acre-feet of water the first year when use begins and then up to 7.99 acre-feet annually from the Missouri: Elk Point aquifer.

The Chief Engineer also filed a petition opposing the Association's request for declaratory ruling, asserting that the Association's petition was "an improper collateral attack on a pending water permit application" and "oppose[d] any contention that the mere construction of a canal constitutes an appropriation of water." Further, the Chief Engineer opposed the Association's claim that it has a right to the waters of McCook Lake because the Association's permitted water rights pertain only to the waters of the Missouri River.

[¶10.] The Board notified the public on June 1, 2023, that it would consider the well permit application during its July 12, 2023, meeting and invited public comment on the application. The Board received well over 200 public comments with the vast majority opposing the approval of the application. The Association filed a petition formally opposing the application on June 12, asserting that the Chief Engineer did not adequately evaluate whether issuing the permit would unlawfully impair the Association's water rights or negatively impact the water levels in McCook Lake. The Association claimed that the canal could leak which would cause the lake to drain. Because the Association pumps water at its own expense to keep the lake full, they claimed that the addition of the canal would require them to pump more water from the Missouri River, which "may be impossible to do[.]" The Association also challenged Dakota Bay's calculations

regarding the amount of water needed to fill and maintain the water levels in the canal and argued that the Chief Engineer could not adequately assess the application without receiving and reviewing detailed plans for the construction and design of the canal.

[¶11.] Because the declaratory ruling and well permit application were related, the Water Rights Program filed a motion to schedule a special meeting of the Board. At its July 12, 2023 meeting, the Board granted the motion and scheduled a special meeting on August 2, 2023, for consideration of Chicoine's well permit application and the Association's petition for declaratory ruling, although the matters were not consolidated.

[¶12.] The Association's counsel issued two subpoenas duces tecum on June 30, 2023, commanding Kevin Robling, Secretary of the South Dakota Department of Game Fish, and Parks, and Ann Mines Bailey, "Attorney for SD Department of Agriculture and Natural Resources," to appear and provide documents for inspection. During the Board's July 12 meeting, Mines Bailey moved to quash the subpoena issued to her on the basis that it was issued directly by counsel without the Board's authority or permission as required by SDCL 1-26-19.1. Additionally, she argued that the subpoena improperly listed her title in that she represented only the Chief Engineer and Water Rights Program, not DANR.[6] Further, she asserted that the subpoena sought privileged information and was improperly

---

6. The Water Rights Program is a program within DANR. SDCL 46-2-4.1 requires that the Chief Engineer be advised by counsel from the Attorney General's Office. Mines Bailey informed the Board that she represents only the Chief Engineer and Water Rights Program and that she did not have access to documents held by DANR.

served. Mines Bailey also challenged the relevance of certain documents requested by the subpoena.

[¶13.] Counsel for GF&P also moved to quash the subpoena for Secretary Robling on the basis that the subpoena was issued without the Board's authority and was overly broad. The Board Chairman noted that he had not received a copy of the subpoenas. The Board granted the motions to quash "based upon arguments of counsel and after considering SDCL 1-26-18, 1-26-19, 1-26-19.1 and 15-6-45." The Association's counsel subsequently filed a motion with the Board requesting that the Board issue a subpoena ordering Secretary Robling to appear and testify during the August 2 meeting. The Prehearing Chairman granted the motion but revised the subpoena to permit Secretary Robling or his designee with knowledge of the relevant matters to appear on his behalf.

[¶14.] The Water Rights Program filed a prehearing brief outlining the basis of its opposition to the Association's petition for declaratory ruling. First, it challenged the scope of the Association's requested relief. The Association sought a declaratory ruling "that the alteration of a public water body by a private party requires a permit for appropriation of water[.]" Such a ruling, the Water Rights Program asserted, was overly broad and would result in a precedent requiring any person seeking to alter a shoreline to also apply for and receive a permit to appropriate water. To narrow the scope of the question before the Board, the Water Rights Program pointed to the language of the public notice, which restricted the issue to Chicoine's construction of the canal and requested that the Board limit the relief granted to the scope of the public notice.

[¶15.] Regarding the Association's claim that the canal would appropriate water from McCook Lake, the Water Rights Program argued that the initial fill would constitute an appropriation, but that the fill could be completed using the one-time appropriation from the irrigation well requested in the well permit application. After the initial fill, the Water Rights Program asserted that "the water in the canal becomes inseparable from the waters of McCook Lake." Finally, the Water Rights Program argued that the construction of the canal would not constitute an unlawful impairment of the Association's water rights because it did not affect their ability to pump water from the Missouri River to fill McCook Lake and the Association does not have a water right in the waters of McCook Lake. Counsel for Chicoine and Dakota Bay provided a notice of appearance on July 21, 2023, and filed a petition opposing the Association's petition for declaratory ruling and joined the Water Rights Program's prehearing brief.

*Association's Petition for Declaratory Ruling*

[¶16.] At the August 2, 2023 hearing, the Board first considered the Association's petition for declaratory ruling. The Board heard testimony from five witnesses: Julie Burhoop, Dirk Lohry, Kip Rounds, Eric Gronlund, and Chicoine. The parties stipulated to several facts including the existence of the Association's water right and water permit to appropriate water from the Missouri River and the fact that Chicoine applied for a shoreline alteration permit and submitted Water Permit Application No. 8744-3. Consistent with the specifications provided on the shoreline alteration application, the parties stipulated that "[t]he finished canal will

be approximately 110-feet wide, 11-feet deep with a flat bottom, and approximately 1,800 feet in length."

[¶17.] The Association first called Julie Burhoop, who serves as the vice president of communications for the Association. Burhoop testified that the Association spends between $50,000 and $150,000 per year to pump water and fill McCook Lake. The Association receives $25,000 per year from the city of North Sioux City, but otherwise funds the pumping operation through fundraising. Burhoop explained that the Association starts pumping in the spring as soon as the water levels in the Missouri River are high enough and pumps continuously until the water level in the lake reaches an elevation of 1,088 fmsl.[7]

[¶18.] The Association also called its president, Dirk Lohry, and admitted Exhibit 5, a graph showing the weekly water levels in the lake over the last ten years. Lohry testified that he began manually measuring the water level after "the flood of 2011." In the spring of each year, Lohry explained that the Association begins pumping water into the lake causing the water level to rise rapidly. Conversely, the water level in the lake drops quickly in the fall when the Association stops pumping water from the Missouri River. Over the last ten years, Lohry testified that the water level fell between zero and six feet per year with an average of 3.7 feet per year.

---

7. Under the terms of its water right and water permit, the Association is authorized to pump anytime the water level falls below 1,090.3 fmsl, the ordinary high-water mark set by DANR. Thus, in wet years with higher natural precipitation, the Association may not be entitled to pump water at all if the lake level never falls below 1,090.3 fmsl. However, in years where the natural water level is low, the Association aims to fill the lake to a level of 1,088 fmsl.

[¶19.] Lohry testified that the lake and canal are "hydrologically connected" meaning that, "[i]f the lake goes down, the canal level goes down. If the canal level would somehow go up, then the lake level would go up because water finds its own level." Based on the plans that he reviewed regarding the canal, Lohry believed the bottom of the canal would be at an elevation of 1,082 fmsl. Therefore, Lohry testified that, in his opinion, if the water in the lake fell below that level, the canal would be empty. Like many oxbow lakes, Lohry testified that McCook Lake is "drying up" and the water level is artificially maintained only through pumping. The Association pumps 11,000 gallons per minute "plus or minus 1,000" when they fill the lake and between 5,000 and 11,000 gallons per minute to maintain the water level once the lake is full.

[¶20.] The Association next called Kip Rounds, the former aquatic habitat and access biologist for GF&P. In that role, Rounds reviewed shoreline alteration applications, including Chicoine's application. Rounds testified that an individual may need to apply for a shoreline alteration permit before engaging in a wide variety of activities below the ordinary high-water mark of a lake. For example, a permit would be required before removing vegetation which alters the lake bottom; installing a sea wall below the ordinary high-water mark; or installing rip rap to stabilize the shoreline. After reviewing Chicoine's permit application, GF&P's engineers believed that the soil in the area where the canal would be constructed was "susceptible to potential seepage" and they recommended that a clay liner be installed to mitigate the amount of water lost. However, if the clay liner dries out,

Rounds testified that it could crack, at which point it would not prevent water loss from seepage.

[¶21.]     The Association finally called Eric Gronlund, the Chief Engineer, who testified that in his opinion, Chicoine and Dakota Bay did not need to obtain a water permit because the canal would not appropriate water from McCook Lake. Gronlund testified that water from the canal and lake would move back and forth freely depending on the water elevation. However, Gronlund testified that Chicoine planned to build a two-foot berm at the entrance to the canal from McCook Lake which would help the canal retain water even if the lake's water level dropped below the level of the berm.

[¶22.]     Gronlund also testified regarding the history of the water rights permitting process in South Dakota. He explained that South Dakota, like other western states, uses the prior appropriation model. Under prior appropriation, also known as "first in time, first in right," an appropriator who establishes their rights first has priority over all subsequent appropriators. In this context, Gronlund defined appropriation as "taking control and possession" of public water. Gronlund explained that there are several different types of water permits authorizing a person or entity to appropriate water for various purposes and durations. A standard or conditional water permit authorizes an ongoing appropriation of water. An individual or entity can also seek a temporary permit for construction, testing, and drilling. Gronlund explained that these types of permits are frequently issued for road construction and filling lagoons and that a temporary permit could be used to initially fill the canal in this case from Chicoine's well.

[¶23.] Regarding the Association's water right and water permit, Gronlund testified that the Association's water rights extend only to the waters of the Missouri River. Once the water is released into McCook Lake, Gronlund testified that the water again becomes public water, and the Association does not have any special right to it. According to Gronlund, nobody holds an appropriative permit to the waters of McCook Lake. Regarding the well permit application, Gronlund testified that the annual appropriation would not be sufficient to fill the lake but would be enough to supplement the canal.

[¶24.] Gronlund also testified that projects similar to Dakota Bay's canal have occurred on other water bodies in the state without first obtaining a water appropriation permit. For example, Gronlund testified that Sunset Harbor and Harbor Bay are manmade canals which extend from Lake Madison, and that Marion Gardens in Fort Pierre is a manmade canal built off the Missouri River. In all three cases, the projects altered the shoreline, but did not require a permit to appropriate water.

[¶25.] The Water Rights Program's counsel also called Gronlund in its case-in-chief. Gronlund explained that the canal "would be part of McCook Lake" rather than a separate structure or body of water. In Gronlund's opinion, the canal would not increase the amount of seepage from McCook Lake and would not change the volume of water in the lake. However, Gronlund acknowledged on cross-examination by the Association that the capacity of the canal could constitute an increase in the volume of the lake, assuming the canal was filled.

[¶26.]     At the conclusion of the proceeding, the Board unanimously denied the Association's petition for a declaratory ruling on the basis that "the building of the canal . . . is not an appropriation of water and doesn't require a permit from this department or the water board."

*Water Permit Application*

[¶27.]     The Board then considered the well permit application and heard testimony from four witnesses: Steen, Chicoine, Rounds, and Lohry. The Water Rights Program first called Steen who had worked for the Water Rights Program as an engineer for three years. In this role, she reviewed water permit applications and conducted field work measuring lake levels through observation wells. Steen reviewed Dakota Bay's water permit application and issued a report to the Chief Engineer analyzing the availability of water from the Missouri: Elk Point aquifer and whether Dakota Bay's proposed use of water would unlawfully impair the rights of others authorized to draw water from the aquifer.

[¶28.]     To calculate the availability of unappropriated water, Steen compared the annual recharge to the aquifer, which Steen defined as "[w]ater entering the aquifer through any means," with the annual withdrawal, defined as "[t]he intentional removal of water from an aquifer." Steen estimated that the aquifer's annual recharge rate was 114,593 acre-feet per year and its annual withdrawal rate, including Chicoine's proposed appropriation, was 100,591 acre-feet per year. Accordingly, Steen testified that "there is a reasonable probability that unappropriated water is available for the proposed appropriation."

[¶29.]     Regarding unlawful impairment of other users' water rights, Steen referenced a map she created, which was admitted as Exhibit 605, which plotted the location of all known domestic wells and wells holding water rights and water permits to the aquifer.[8]



Steen testified that in her opinion "there is a reasonable probability any interference from the proposed appropriation will not cause an unlawful impairment on existing water right and permit holders and domestic uses with adequate wells." Her opinion was based on factors including "[t]he tremendous resource that the Missouri: Elk Point aquifer is, the saturated aquifer thickness at the existing well site, the volume requested by this application is small, and that

---

8.     The map depicts the location of the irrigation well in relation to the southeastern tip of McCook Lake where the proposed canal would be constructed. Based on other information in the record, it appears that the canal would be constructed between the southeastern tip and the irrigation well marked with a black star in a pink circle. However, the canal would not extend the entire length between those two points.

this well has been diverting at this rate since 2005 without any well interference complaints within the entire aquifer."

[¶30.] Steen also responded to the Association's contentions that the approval of the permit would unlawfully impair its water right and permit by undermining its efforts to keep McCook Lake full. Steen explained that the Water Rights Program "generally only look[s] at water rights completed into the same water source. If we aren't seeing an unlawful impairment within that water source at that time, we would not expect to see an unlawful impairment from permit users in outside water sources." Steen explained that, although it was not within the scope of her review, she "would not anticipate a Missouri: Elk Point water right or a permit to unlawfully impair a Missouri River water right at this time, given what [she] knows for water availability in the river and from what we are seeing on how observation wells react in the aquifer." In summation, Steen testified that she did not believe "approval of this permit would have a measurable effect on the waters of McCook Lake."

[¶31.] During cross-examination by the Association, Steen testified that she was unaware of a statute or rule limiting her review of unlawful impairment to water rights and permits in the same water source and acknowledged that "[i]t's possible" that a water right from one source could impair a water right in another source. However, she reaffirmed her position that if unlawful impairment is not occurring in the proposed water source (here, the Missouri: Elk Point aquifer), she would not expect to see unlawful impairment in other water sources (e.g., the Missouri River). Steen testified that she did not review the canal design

specifications, soil type, or whether the amount of water requested would be sufficient to prevent the canal liner from drying out and cracking. She emphasized that the Water Rights Program does not participate in calculating the amount of water necessary to accomplish a particular project or purpose, such as filling and maintaining a canal, and instead relies on the figures provided by the applicant to calculate availability and the risk of unlawful impairment.

[¶32.] Chicoine testified on behalf of Dakota Bay about his plans for the construction and use of the canal. Chicoine explained that Dakota Bay owns land near McCook Lake, including the land that the canal would be constructed on, which is currently farmland. Chicoine testified that building the canal would give him better access to his property, turn 15 existing lots into lakefront properties, and provide for better public access to the lake. Concerning public access, Chicoine testified that the existing boat ramp "is very steep and the parking is very poor" and he intends to install a public boat ramp on the canal. In his view, Chicoine believed the canal would provide additional recreational opportunities that would benefit the public and wildlife by creating more habitat for fish.

[¶33.] During cross-examination, Chicoine was questioned about some of the details of the canal project. Chicoine testified that the canal would be lined with an 18-inch fat clay liner to prevent seepage. In the event that the liner was damaged, Chicoine explained that he would endeavor to promptly fix it, and that he would pump water into the canal to maintain the integrity of the rest of the liner. In response to questions from the Board, Chicoine testified that the amount of water requested in the application was determined by his engineer, Scott Gernhart, who

calculated the estimated annual evaporation and seepage loss from the canal. Chicoine testified that he intends to pump water every year into the canal and plans to regularly monitor the water levels in the canal to determine when water needs to be added. Chicoine agreed to comply with any requirements imposed by the Board, including monitoring and pumping a specified amount of water each year to maintain the canal, if requested.

[¶34.] After Chicoine's testimony, the Association moved for judgment as a matter of law, asserting that Dakota Bay did not carry its burden of proving that the appropriation would have a beneficial use, that it was in the public interest, and that it did not unlawfully impair the Association's water rights. The Association argued that because Dakota Bay did not call Gernhart to testify or produce evidence regarding the canal's design, the Board could not evaluate the amount of water needed to keep the canal liner from failing. The Chairman reserved ruling on the motion until the close of the evidence.

[¶35.] The Association called Rounds to testify about GF&P's concerns with the canal liner. Rounds testified that after reviewing Chicoine's application, GF&P's engineers were concerned that if the liner dried out, it could crack, float, or otherwise fail resulting in water seeping into the ground at a higher rate. Rounds testified that GF&P would not continually monitor the liner or check for damage.

[¶36.] During cross-examination, Rounds testified that if GF&P develops concerns about a project, they will communicate those concerns to the applicant. Rounds stated that Chicoine had been active in addressing the concerns raised and submitted the water permit application in response to GF&P's request to provide a

means of keeping the liner wet. Rounds testified that keeping the liner from drying out would be a beneficial use of water which would "benefit everybody[.]"

[¶37.] The Association called Lohry as its final witness. Counsel attempted to elicit testimony regarding Lohry's concerns about the integrity of the canal liner. Counsel for the Water Rights Program and Dakota Bay objected to this line of questioning on relevance grounds, which the Chairman sustained concluding that "the question before the board is not whether the liner will fail or is of a certain quality. We are just here to decide whether the four factors are met on the water permit." The Chairman, however, overruled one objection, permitting Lohry to testify that if the pump in the irrigation well fails or Chicoine chooses not to pump water into the canal, the Association will bear the burden of ensuring the canal remains filled.

[¶38.] After the close of the evidence, the Chairman denied the Association's earlier motion for judgment as a matter of law and the parties presented their closing arguments. The Water Rights Program and Dakota Bay argued that the Board should approve the application because Dakota Bay met its burden of establishing the availability of unappropriated water, a beneficial use in the public interest, and that the permit would not unlawfully impair other permit holders' rights. The Association argued that Dakota Bay failed to prove beneficial use, public interest, and lack of unlawful impairment of its water rights. The Association requested that the Board either deny the application or defer ruling until Dakota Bay provided more information on the design details for the

construction of the canal and liner and their plans to ensure that the liner would be properly maintained.

[¶39.] The Board voted to approve the application with four votes in favor and one abstention. The Chairman directed counsel for the Chief Engineer to draft proposed findings of fact and conclusions of law for both cases. After the Association filed its objections, the Board's counsel prepared the final findings and conclusions addressing the Association's objections as required by SDCL 1-26-25. The Board approved the findings of fact and conclusions of law during its meeting On September 22, 2023.

[¶40.] Regarding the Association's petition for declaratory ruling, the Board found that "[o]nce constructed, the canal extends the shoreline of the lake and becomes part of the lake." The Board concluded that to complete the initial fill of the canal after construction, Chicoine could apply for a temporary permit under SDCL 46-5-40.1. However, the Board found that "[t]he construction of the proposed canal does not constitute an ongoing appropriation of McCook Lake water and, therefore, does not require a standard or traditional water right." Accordingly, the Board denied the Association's petition for declaratory ruling.

[¶41.] Regarding Chicoine's well permit application, the Board found that "there is a reasonable probability that there is unappropriated water available to fulfill the amount requested by the application" and that the diversion of the requested water will not unlawfully impair preexisting water rights or domestic water uses. Additionally, the Board found that "[t]he proposed use for recreation is a beneficial use" and "this appropriation of water for recreation is in the public

interest." Based on these findings, the Board approved Chicoine's well permit application.

[¶42.] The Association appealed the Board's rulings to the circuit court. Regarding the declaratory ruling, the Association challenged the Board's determination that the canal construction project did not require a water right permit because it would not result in an "ongoing appropriation" of McCook Lake water. Concerning the well permit application, the Association argued that the Board erred by approving the application because the record did not establish that the proposed appropriation would be a beneficial use or in the public interest. The Association also challenged the Board's decision to quash its subpoenas arguing that SDCL 15-6-45(a) expressly allows an attorney of record to issue a subpoena without requesting leave from the Board.

[¶43.] The parties appeared before the circuit court on April 9, 2024, and presented oral argument. The court took the matter under advisement and issued a memorandum decision on July 2, 2024, affirming the Board's decisions to approve Chicoine's well permit application and deny the Association's request for declaratory ruling. The circuit court also affirmed the Board's decision to quash the subpoenas, holding that although "[t]he clear language of both SDCL 15-6-45(a) and SDCL 1-26-19.1 supports [the] Association's position that the subpoenas were validly issued by its attorney without leave of the Board[,]" the Association failed "to effect service pursuant to SDCL 15-6-45(c) making the Board's decision to quash valid on that basis alone." The court concluded that even if the Board erroneously quashed the subpoenas, the Association did not establish prejudice.

[¶44.]     The Association appeals, raising the following issues for our review:

   1.   Whether the circuit court erred in affirming the Board's decision that Chicoine/Dakota Bay's proposed canal construction did not require a permit to appropriate water from McCook Lake.

   2.   Whether the circuit court erred in affirming the Board's ruling that Dakota Bay, LLC, carried its burden of establishing that the use of water described in Water Permit Application No. 8744-3 was a beneficial use and in the public interest.

[¶45.]     The Chief Engineer filed a notice of review, raising the following issue:

   3.   Whether the circuit court erred by concluding that the Rules of Civil Procedure applied to a hearing before the Water Management Board.

## Analysis

[¶46.]     Our standard of review of agency decisions is governed by SDCL 1-26-36. *See Matter of Ehlebracht*, 2022 S.D. 46, ¶ 22, 978 N.W.2d 741, 749 ("The provisions of SDCL 1-26-36 delineate the standard for a circuit court's review of an administrative agency's decision, and the same rules apply on appeal to this Court." (citation modified)).  We review the Board's findings of fact under the clearly erroneous standard.[9]  *In re Water Right Claim No. 1927-2*, 524 N.W.2d 855, 857 (S.D. 1994).  Issues of law "are fully reviewable by this Court under the de novo

---

9.   We take this opportunity to reiterate that the appropriate standard of review for agency findings is the clearly erroneous standard.  SDCL 1-26-36.  We recognized the abrogation of the substantial evidence standard in *Sopko v. C & R Transfer Co., Inc.*, following the amendment of SDCL 1-26-36 in 1978.  1998 S.D. 8, ¶ 7, 575 N.W.2d 225, 228–29; *see also Kirwan v. City of Deadwood*, 2023 S.D. 20, ¶ 29, 990 N.W.2d 108, 116 (noting that the clearly erroneous standard and substantial evidence standard "are not interchangeable").

standard." *Blazer v. S.D. Dep't of Pub. Safety*, 2024 S.D. 74, ¶ 15, 15 N.W.3d 488, 493 (citation omitted).

[¶47.] We review "[q]uestions of statutory interpretation and application . . . under the de novo standard of review with no deference to the circuit court's decision." *McKie Ford Lincoln, Inc. v. Hanna*, 2018 S.D. 14, ¶ 10, 907 N.W.2d 795, 798 (citation omitted). "The starting point when interpreting a statute must always be the language itself." *Blazer*, 2024 S.D. 74, ¶ 18, 15 N.W.3d at 493 (citation omitted). "When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed." *Id.* (citation omitted). "In conducting statutory interpretation, we give words their plain meaning and effect, and read statutes as a whole." *Id.* at 493–94 (citation omitted).

### 1. *Whether the circuit court erred in affirming the Board's decision that Chicoine/Dakota Bay's proposed canal construction does not require a permit to appropriate water from McCook Lake.*

[¶48.] South Dakota, like other arid western states, abolished the common law rule of riparian water rights in favor of a system of prior appropriation. *See Parks v. Cooper*, 2004 S.D. 27, ¶ 43, 676 N.W.2d 823, 837. Under this system, "all water within the state is the property of the people of the state, but the right to the use of water may be acquired by appropriation as provided by law." SDCL 46-1-3. "[T]he state shall determine what water of the state, surface and underground, can be converted to public use or controlled for public protection." SDCL 46-1-1.

[¶49.] "A person may request the water management board to issue a decision on the applicability of a statutory provision, rule, or order pertaining to a

submitted factual situation within the board's jurisdiction[.]" ARSD 74:02:01:46. Accordingly, the Association requested that the Board "issue a Declaratory Ruling finding that the expansion of a public body of water for private use or gain (such as by altering the shoreline of a lake and connecting a 'canal') requires a permit to appropriate water." "Except as otherwise provided . . . , no person may appropriate the waters of this state for any purpose without first obtaining a permit to do so." SDCL 46-1-15. Accordingly, if a person appropriates the waters of the state, they must obtain a permit. Thus, the question before the Board was whether the construction of the canal would result in an appropriation of waters from McCook Lake.

[¶50.] We have not previously had occasion to consider the definition of the term "appropriate" as it is used in SDCL chapter 46-1, and it is not defined by statute or administrative rule. Therefore, we endeavor to discover its ordinary meaning beginning with dictionary definitions. *See Jackson v. Canyon Pl. Homeowner's Ass'n, Inc.*, 2007 S.D. 37, ¶ 11, 731 N.W.2d 210, 213. Black's Law Dictionary defines "appropriation" as "[t]he exercise of control over property, esp. without permission; a taking of possession." *Appropriation*, Black's Law Dictionary (12th ed. 2024). "Possession" has several relevant definitions, including "[t]he fact of having or holding property in one's power; the exercise of dominion over property[,]" "[t]he right under which one may exercise control over something to the exclusion of all others; the continuing exercise of a claim to the exclusive use of a material object[,]" and "[t]he detention or use of a physical thing with the intent to hold it as one's own." *Possession*, Black's Law Dictionary (12th ed. 2024). Using

definitions similar to these, the Water Rights Program argues that appropriation requires exclusive possession. After the canal is initially filled, which will be accomplished through the well permit, Gronlund testified that the canal and lake will become one body of water. Because the water will flow freely between the canal and McCook Lake, the Water Rights Program argues the canal will not appropriate water from McCook Lake.

[¶51.] The Association points to a definition found in Merriam-Webster's online dictionary, which provides that "appropriate" means "to set apart for or assign to a particular purpose or use." *Appropriate*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/appropriate (last visited Sep. 16, 2025). The Association asserts that Merriam-Webster's definitions establish that "appropriate" means "to take possession of, to set aside, or assign for a particular use." However, Merriam-Webster additionally defines "appropriate" as "to take *exclusive* possession of." *Id.* (emphasis added). Regardless, under its reading of the Merriam-Webster definitions, the Association argues that when it fills McCook Lake every year, "that same water will flow from McCook Lake into the canal" and "[t]he water will be taken possession of, set aside, or used to maintain water levels in the canal to benefit the private development, properties, and parties adjacent to the canal."

[¶52.] While there may be different definitions of the term "appropriate" depending on the context in which it is used, when formulating a definition for appropriation as it is used in SDCL chapter 46-1, we must also consider the fact that the concept of water appropriation is firmly rooted in the legal framework of

jurisdictions allocating water under the principles of prior appropriation. Therefore, to guide our analysis of this question, we look to definitions adopted by other jurisdictions. In Colorado, the Legislature has defined "appropriation" as "the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law[.]" Colo. Rev. Stat. Ann.§ 37-92-103(3)(a). The Supreme Court of Colorado determined that appropriation "consists of an actual diversion of water with the intent to apply it to a beneficial use and application of that water to a beneficial use." *V Bar Ranch LLC v. Cotten*, 233 P.3d 1200, 1208 (Colo. 2010) (en banc).

[¶53.]     The Supreme Court of Nebraska similarly stated that, "[a]n appropriation right is a right to divert unappropriated surface water for beneficial use." *In re Appropriation A-7603 v. Neb. Dep't of Nat. Res.*, 868 N.W.2d 314, 321 (Neb. 2015). The United States Supreme Court also recognized an element of exclusivity in that, "[a]n appropriator is entitled to the 'exclusive control [of his appropriated water] so long as he is able and willing to apply it to beneficial uses[.]'" *Montana v. Wyoming*, 563 U.S. 368, 380 (2011) (second alteration in original). After consideration of these definitions, it is evident that three consistent elements emerge in the context of an appropriation of water. It is apparent that "appropriation" includes a taking of possession or exercise of control over water to the exclusion of others to be put to a beneficial use.

[¶54.]     The Board found that "[o]nce constructed, the canal extends the shoreline of the lake and becomes part of the lake." This finding is supported by Gronlund's testimony that the water in the lake and canal would move freely

depending on the water elevation and Lohry's testimony that the canal and lake would be "hydrologically connected" because "water finds its own level." Gronlund also testified that Chicoine's plans for the construction of the canal did not include a barrier separating the lake from the canal. In light of this testimony, the record establishes that Dakota Bay and Chicoine will not take exclusive possession or exercise exclusive control over the waters in the canal and, therefore, the Board correctly determined that the construction of the canal will not result in the appropriation of water from McCook Lake.[10]

[¶55.] The Association raises an alternative, but related, argument that the canal is a "water work" which requires a water appropriation permit to construct. SDCL 46-5-9 provides that "[n]o person may begin or carry on any construction of

---

10. The Association specifically challenges the Board's determination that the construction of the canal will not result in an "ongoing appropriation" of water. In the Association's view, the Board adopted a new legal standard without a statutory basis. But a careful review of the Board's findings reveals that the Board's reference to an "ongoing appropriation" was made in the context of the types of permits available. In findings of fact (FF) 25, the Board found that the canal project did not require a "standard or traditional water right" because there was no "ongoing appropriation" of water. In FF 26, the Board noted that the initial fill of the canal can be achieved through a "temporary permit for the use of public waters for construction, testing, or drilling purposes pursuant to SDCL § 46-5-40.1."

When viewed in context, we are not convinced that the Board adopted or applied a new legal standard requiring an "ongoing appropriation" of water. The Board referenced Gronlund's testimony explaining the types of appropriative permits "including a standard or traditional type of permit which is required for an appropriation that occurs annually and a temporary permit for the use of public waters for construction, testing, and drilling purposes which has a limited duration." Thus, the Board's reference to an "ongoing appropriation," paired with its finding that a standard or traditional water permit was not needed, reflects simply that the Board did not believe that after the initial fill, the canal would appropriate water from McCook Lake.

works for storing or carrying water until a permit to appropriate the water has been issued." The Association argues that a permit was required because "Dakota Bay's proposed canal is indisputably a water works, uses water from McCook Lake, stores water, and has the potential to be a beneficial use of water." The Board focused exclusively on the arguments regarding appropriation and did not make findings or conclusions on this issue.

[¶56.] The Association does not argue that the canal will carry water, therefore the only question is whether it will be a "work[] for storing . . .water[.]" "Store" is ordinarily defined as "[t]o keep . . . in safekeeping for future delivery in an unchanged condition" or to "lay away, accumulate[.]" *Store*, Black's Law Dictionary (12th ed. 2024); *Store*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/store (last visited Sep. 16, 2025). We have not yet had the opportunity to determine what constitutes a work for storing water under SDCL 46-5-9, however our prior decisions provide guidance.

[¶57.] In *Robbins v. Rapid City*, we discussed a proposed contract between the United States and the city of Rapid City whereby the United States would construct a dam to collect water from a stream to be stored in a reservoir. 23 N.W.2d 144, 179 (S.D. 1946). Under the contract, the United States would release the stored water throughout the year into Rapid Creek to be taken by the city for use in its water system. *Id.* at 187. We considered the ownership of the water when held at various points in the system and concluded that when the water entered the city's water mains, it was owned by the city. *Id.* We assumed, but did not decide, that the water was owned by the United States when it was accumulated and stored

prior to being released. *Id.* at 180. Similarly, *Belle Fourche Irrigation District v. Smiley* concerned the diversion of waters from the Belle Fourche River through a series of dams to be stored in reservoirs and subsequently used for irrigation, domestic, and municipal purposes. 176 N.W.2d 239, 241 (S.D. 1970). In both cases, the "stored" waters were accumulated or diverted from another source and held until they were released for a particular purpose. *See also Bd. of Cnty. Commr's of Cnty. of Arapahoe v. Crystal Creek Homeowner's Ass'n*, 14 P.3d 325, 332 (Colo. 2000) (reservoir to collect and store water in wet years to be used in dry years and to regulate the flow of water throughout the year).

[¶58.]     Here, the canal does not "store" water in the manner contemplated in *Robbins* and *Smiley*. The canal would hold water depending on the water elevation, but the water in the canal is not subject to a possessory interest, nor is there an intent to remove the water to be put to another use. Plainly, the canal is not a holding place to accumulate water until the water is needed elsewhere. Accordingly, we conclude that the canal is not a "work for storing water" as used in SDCL 46-5-9 and Dakota Bay is, therefore, not required to obtain a permit to appropriate water from McCook Lake prior to beginning construction.

> **2.      Whether the circuit court erred in affirming the Board's ruling that Dakota Bay, LLC, carried its burden of establishing that the use of water described in Water Permit Application No. 8744-3 was a beneficial use and in the public interest.**

[¶59.]     "A permit to appropriate water may only be issued if there is reasonable probability that unappropriated water is available for the applicant's proposed use, the proposed diversion can be developed without unlawful

impairment of existing domestic water uses and water rights, the proposed use is a beneficial use, and the permit is in the public interest[.]" SDCL 46-2A-9. If the Chief Engineer's recommendation to grant or deny the permit application is contested pursuant to SDCL 46-2A-4(4) or 46-2A-23, the matter is scheduled for a hearing before the Board. "If the Water Management Board determines, based upon the evidence presented at the hearing, that the applicable requirements for the permit . . . have been met, it shall approve the permit[.]" SDCL 46-2A-7.

[¶60.]        On appeal, the Association does not challenge the first two factors of availability and unlawful impairment. Thus, we turn to whether the proposed appropriation of water will be a beneficial use and whether granting the permit is in the public interest. These two factors are intertwined. "Beneficial use" is broadly defined by statute as "any use of water within or outside the state, that is reasonable and useful and beneficial to the appropriator, and at the same time is consistent with the interests of the public of this state in the best utilization of water supplies[.]" SDCL 46-1-6(3).

[¶61.]        The Board found "that the proposed use of the water for recreation, to fill the proposed canal and replace losses of water due to evaporation or seepage, constitutes a beneficial use." The Board further found "that placing the water to this beneficial use is in the public interest." Indeed, the record contains considerable support for these findings. Chicoine testified that the canal would create additional lakefront property and space for boating, jet skiing, and fishing. The canal would also provide an opportunity for better public access to McCook Lake given Chicoine's plans to construct a new public boat ramp. Rounds testified

that pumping water from the irrigation well to ensure the canal liner would not dry out was a beneficial use of water. The Association does not challenge the conclusion that recreational opportunities on the lake and the maintenance of the canal liner would be beneficial uses for the water and in the public interest.

[¶62.]     However, the Association asserts that the evidence presented was insufficient because Dakota Bay did not offer in support of its application the design details or specifications of the canal and the calculations used to determine the amount of water requested. With an eye towards potential future problems, the Association argues that "[i]f the canal cannot hold water, or if the amount of water authorized by the water permit is insufficient to satisfy the concerns raised by [GF&P], then pumping water into the canal would not only be unbeneficial but would also be wasteful." On this same basis, it further argued that "no public interest is served if the water is pumped into a canal that is inadequately designed or built."

[¶63.]     While it is true that Chicoine did not provide detailed plans for the construction of the canal, he introduced evidence regarding some of the project specifications relevant to his permit application. The shoreline alteration application shows that the canal will be 1,800 feet long, 110 feet wide, and 11 feet deep, and Chicoine testified that it will be lined with an 18-inch fat clay liner. The Board also received Chicoine's exhibit showing Gernhart's conclusions regarding the amount of water needed to initially fill the canal and to offset any ongoing water loss from evaporation and seepage. This foundational evidence provided the Board

with the rationale for the amount of water requested and the details of the project sufficient for it to determine where the water would be used and for what purpose.

[¶64.]       The Legislature empowered the Board to exercise powers of "general supervision of the waters of the state, including measurement, appropriation, and distribution thereof," and to "regulate and control the development, conservation, and allocation of the right to use the waters of the state according to the principles of beneficial use and priority of appropriation[.]" SDCL 46-2-9 and 46-2-11. The Legislature also made a series of policy determinations regarding the use of water, including that "the waste or unreasonable method of use of water [should] be prevented[.]" SDCL 46-1-4. Accordingly, it is within the purview of the Board to determine whether appropriated water is being wasted. However, the statutory procedure for granting a permit to appropriate water does not require that the Board speculate about whether an appropriation which begins as a beneficial use will become wasteful at some point in the future.[11]

[¶65.]       An examination of the relevant statutory provisions establishes that the requirement of beneficial use is an ongoing obligation. "Beneficial use is the

---

11.    DANR suggests in its brief that if the Board was required to consider the future success of a project prior to issuing a water permit, "no water permit would ever be able to be granted." As an illustration of the problems attendant to adding a future success criteria, DANR provides the following examples: "When irrigation permits are granted to farmers, the Chief Engineer and the Board do not inquire about what kinds of crops the farmers will grow, what types of fertilizer they plan to use, what expected yields are, or what specific irrigation manufacturers will provide equipment. . . . Similarly, the beneficial use of the Association's own recreational permit to pump water from the Missouri River to maintain lake levels is not dependent on showing how many boats use the lake, how many fish are caught, how many kids swim in the summer, or even whether the lake level is maintained."

basis, the measure and the limit of the right to the use of waters[.]" SDCL 46-1-8. While an applicant may initially be granted a permit to appropriate water, the failure to "use beneficially any part of the water for the purpose for which it was appropriated" for a statutorily defined period results in the loss of the right to appropriate the water. SDCL 46-5-37. If a permit holder violates the terms of their permit, the Board has the authority to revoke the permit. SDCL 46-1-12. The Chief Engineer can also order a person to discontinue the use of water that they do not have the legal right to use. SDCL 46-2-18. If a permit holder wishes to change the use of their appropriated water, the Board considers anew whether the appropriation "is for a beneficial use and in the public interest" prior to granting the amended permit. SDCL 46-2A-12. Indeed, Chicoine submitted the permit application here despite his existing permit to appropriate water from the irrigation well because he sought to use the water to fill and maintain the canal rather than for irrigation.

[¶66.] These provisions provide mechanisms through which the Chief Engineer and the Board can reassess the allocation of water based on its actual use. It is through these provisions that the Board can determine, based on the unique facts of the application before it, whether water is being put to an improper use or is being wasted contrary to the public policy of the state. However, prior to granting a permit to appropriate water, the only nonspeculative information available to the Board is the intended use of the water. Here, the Board was presented with testimony that the water would be used to fill and maintain the structural integrity of the canal, which would have a recreational purpose. Accordingly, Dakota Bay

-33-

provided sufficient evidence for the Board to determine that the proposed use of the appropriated water would be a beneficial use that is consistent with the interests of the public. Based on our review of the record, these findings were not clearly erroneous.

### 3. Whether the circuit court erred by concluding that the rules of civil procedure applied to a hearing before the Water Management Board.

[¶67.] The Chief Engineer challenges the circuit court's application of the rules of civil procedure to the proceedings before the Board. The applicability of the rules of civil procedure is a question of law, which we review de novo. *Abdulrazzak v. Bd. of Pardons & Paroles*, 2020 S.D. 10, ¶ 9, 940 N.W.2d 672, 675 ("[W]e review 'legal questions arising under the rules of civil procedure de novo, utilizing our established rules for statutory construction.'" (citation omitted)). On appeal to the circuit court, the Association asserted that the Board erred by quashing the two subpoenas duces tecum issued by the Association's counsel. The circuit court concluded that the subpoenas were validly issued by counsel under both SDCL 1-26-19.1 and 15-6-45(a) but that the Association failed to effect proper service, thereby rendering the subpoenas invalid.[12] Ultimately, the court concluded that even if the Board erred in quashing the subpoenas, the Association did not establish prejudice.

---

12. It appears that the subpoena issued to Mines Bailey was served on an administrative assistant working for DANR rather than personally on Mines Bailey. Under the rules of civil procedure, subpoenas are to be served in the same manner as a summons, except that a subpoena may not be served by publication. SDCL 15-6-45(c). The circuit court concluded that personal service was required and that the service on the administrative assistant or through mailing to counsel was ineffective.

[¶68.]     The Chief Engineer argues that the procedure in a contested case before the Board is governed exclusively by the Administrative Procedures Act (APA) set forth in SDCL chapter 1-26.  The Association did not file a brief in response to the Chief Engineer's notice of review.  However, the Association argued to the circuit court that the subpoenas were properly issued by counsel under the rules of civil procedure because SDCL 15-6-45(a) provides that an attorney of record can issue a subpoena "in *any action or proceeding*, or collateral hearing, civil or criminal[.]"  (Emphasis added.)  Further, the rule provides that "[w]hen an attorney issues a subpoena, the attorney must contemporaneously transmit a copy thereof to the clerk of the court, or to the secretary or other filing officer of the *board or tribunal* in which the matter is pending, for filing."  *Id.* (emphasis added).  The Association argued that the Board is a "board or tribunal" as used in SDCL 15-6-45(a) and that requiring parties to request a subpoena from the Board would allow the Board, "without any guiding principles or standards, to deny a subpoena and thus deny a party's ability to present evidence."

[¶69.]     "SDCL 15-6-1 provides that the rules of civil procedure govern the procedure in the *circuit courts*.  Unless otherwise provided by statute or by proclamation of this court, such rules apply to no other proceedings."  *Perrine v. S.D. Dep't of Lab.*, 431 N.W.2d 156, 159 (S.D. 1988).  SDCL 1-26-19.1 provides, in relevant part:

> Each agency and the officers thereof charged with the duty to administer the laws of this state and rules of the agency shall have power to administer oaths as provided by chapter 18-3 and to subpoena witnesses to appear and give testimony and to produce records, books, papers and documents relating to any

> matters in contested cases and likewise issue subpoenas for such
> purposes for persons interested therein as provided by § 15-6-45.

Accordingly, SDCL 1-26-19.1 authorizes an agency to issue subpoenas on its own behalf and "upon application of any person having a cause or any matter pending in court or before such agency, officer or tribunal" as provided by SDCL 15-6-45(a). SDCL 1-26-18 provides that a party to a contested case "may have subpoenas issued to compel attendance of witnesses and production of evidence in the party's behalf." Thus, a party in a contested case, such as the Association, can request that the Board issue subpoenas under its authority in SDCL 1-26-19.1 to assist with the party's presentation of their case. However, neither SDCL 1-26-19.1 nor any other provision of the APA provide authority for *attorneys of record* to issue subpoenas in such proceedings. Accordingly, we conclude that the provisions of the rules of civil procedure authorizing attorneys of record to issue subpoenas do not apply to administrative proceedings of contested cases governed by SDCL chapter 1-26. Parties in contested proceedings must request that subpoenas be issued on their behalf by the administrative agency, officer, or tribunal presiding over the proceedings.

[¶70.] Although the circuit court erroneously relied on the rules of civil procedure, we affirm the circuit court's conclusion that the Board did not abuse its discretion by quashing the subpoenas. We review a decision to quash a subpoena for an abuse of discretion. *Bruggeman by Black Hills Advoc., LLC v. Ramos*, 2022 S.D. 16, ¶ 34, 972 N.W.2d 492, 504. "[A] [circuit] court may still be upheld if it reached the right result for the wrong reason." *Aggregate Const. Inc. v. Aaron Swan & Assocs., Inc.*, 2015 S.D. 79, ¶ 14 n.3, 871 N.W.2d 508, 512 n.3 (citation omitted).

Under the APA, counsel improperly issued subpoenas without authority from the Board. Accordingly, the Board did not abuse its discretion and the circuit court correctly affirmed the Board's determination.

## Conclusion

[¶71.] We conclude that the circuit court properly affirmed the Board's denial of the Association's petition for declaratory ruling seeking a declaration that the alteration of the shoreline of McCook Lake to construct a canal requires a permit to appropriate water from McCook Lake. The Board correctly concluded that the proposed construction of the canal will not result in an appropriation of water from McCook Lake and appropriately denied the Association's petition on that basis. Additionally, we affirm the circuit court's ruling that the Board did not err by finding that Dakota Bay's proposed use of water from the irrigation well is a beneficial use in the public interest. We also affirm the circuit court's ruling that the Board did not abuse its discretion by quashing the Association's subpoenas but hold that the procedure for issuing subpoenas in administrative proceedings is governed by the APA, rather than the rules of civil procedure.

[¶72.] SALTER, DEVANEY, and MYREN, Justices, and MOWERY, Circuit Court Judge, concur.

[¶73.] MOWERY, Circuit Court Judge, sitting for JENSEN, Chief Justice, who deemed himself disqualified and did not participate.